| | |
|---|---|
| DISTRICT COURT, CITY & COUNTY OF DENVER<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | |
| **ALEX BOODROOKAS;**<br>**KYLE MONTANIO;**<br>**SARAH NAPIER;**<br>**ALEXANDRIA NICKENS;**<br>**ELOWYN FAHNESTOCK;**<br>**SPENCER PAJK;**<br>**JOIE HA;**<br>**HARRIET FALCONETTI;** | DATE FILED<br>April 9, 2025 9:00 AM<br>FILING ID: B6B724179CA5A<br>CASE NUMBER: 2025CV31286<br><br><br>▲ COURT USE ONLY ▲ |
|    Plaintiffs,<br><br>v.<br><br>**POLICE CHIEF JASON MOLLENDOR**, in his individual capacity;<br>**CORPORAL JOSHUA BODE**, in his individual capacity;<br>**OFFICER CORRIE CURRY**, in his individual capacity;<br>**OFFICER JOHN GASCHLER**, in his individual capacity;<br>**DETECTIVE LANCE MUNIZ**, in his individual capacity;<br>**OFFICER JOSEPH FLAGEOLLE**, in his individual capacity;<br>**SERGEANT ERIC MARTINEZ**, in his individual capacity,<br><br>   Defendants. | |
| Attorneys for Plaintiff:<br><br>Azra Taslimi, #44317<br>Matthew Cron, #45685<br>RATHOD \| MOHAMEDBHAI LLC<br>2701 Lawrence Street, Suite 100<br>Denver, CO 80205<br>(303) 578-4400 (t) / (303) 578-4401 (f)<br>at@rmlawyers.com<br>mc@rmlawyers.com | Case No:<br><br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

**EXHIBIT**

**2**

Plaintiffs, by and through their attorneys Azra Taslimi and Matthew J. Cron, of RATHOD |
MOHAMEDBHAI LLC, respectfully allege as follows:

## I.  <u>WHAT THIS CASE IS ABOUT</u>

Universities are more than just institutions of academic learning; they are vital spaces for
free expression, debate, and social change. From the Civil Rights Movement of the 1950s and
1960s to the present day, student-led activism has played a crucial role in challenging injustice
and shaping public discourse.

In the spring of 2024, university campuses across the United States became epicenters of
protest in response to Israel's military actions in Gaza. Students, faculty, and community
members mobilized, demanding transparency and divestment from university investments tied to
Israel's military operations. Auraria Campus[1]  was no exception. In April 2024, demonstrators
gathered at Tivoli Quad, a designated public forum explicitly intended for expressive activity, to
peacefully voice their opposition.

Rather than respecting the constitutional rights of those gathered, Auraria Campus Police
Department ("ACPD") officers abrogated well-established First Amendment rights through
intimidation and mass arrests. Protesters who peacefully linked arms in solidarity were trapped
and encircled by riot police, physically prevented from leaving before officers began making
arrests. Many never heard dispersal orders, while others, who were not even part of the seated
protest that drew law enforcement ire, were grabbed at random and arbitrarily designated as
"agitators" without cause.  Law enforcement did not distinguish between any class of protestors
in carrying out these mass indiscriminate arrests.

---

[1] The Auraria Campus is shared by three separate higher education institutions: Community
College of Denver, Metropolitan State University of Denver, and University of Colorado
Denver.

The stated justification for law enforcement's intervention was to enforce an Auraria Campus's policy that prohibited the setting up of tents for living accommodations or housing. However, ACPD officers continued arresting individuals even after all the tents had been voluntarily dismantled and removed, proving that the supposed justification for intervention was pretext. The arrests on April 26, 2024 were not about enforcing campus policies, they were about punishing protestors for their views.

This lawsuit seeks to hold Defendants accountable for their unconstitutional suppression of free speech and assembly. It is a challenge to the selective enforcement, retaliatory policing, and flagrant violations of First and Fourth Amendment rights. Protesters were not arrested for violating the law, they were arrested because of the message they expressed. The Constitution does not allow the government to decide which voices should be heard and which should be silenced.

## II.  <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over this case pursuant to Colo. Const. art. VI, § 9(1), and C.R.S. § 13-21-131.

2.      Venue is proper in this Court pursuant to Colo. R. Civ. P. 98(c), in that all the events and omissions alleged herein occurred within Denver County, Colorado.

## III.  <u>PARTIES</u>

3.      At all times relevant to the Complaint, Plaintiff Professor Alex Boodrookas was a citizen of the United States and a resident of and domiciled in the State of Colorado.

4.      At all times relevant to the Complaint, Plaintiff Professor Kyle Montanio was a citizen of the United States and a resident of and domiciled in the State of Colorado.

3

5.      At all times relevant to the Complaint, Plaintiff Sarah Napier was a citizen of the United States and a resident of and domiciled in the State of Colorado.

6.      At all times relevant to the Complaint, Plaintiff Elowyn Fahnestock was a citizen of the United States and a resident of and domiciled in the State of Colorado.

7.      At all times relevant to the Complaint, Plaintiff Alexandria Nickens was a citizen of the United States and a resident of and domiciled in the State of Colorado.

8.      At all times relevant to the Complaint, Plaintiff Spencer Pajk was a citizen of the United States and a resident of and domiciled in the State of Colorado.

9.      At all times relevant to the Complaint, Plaintiff Harriett Falconetti was a citizen of the United States and a resident of and domiciled in the State of Colorado.

10.     At all times relevant to the Complaint, Plaintiff Joie Ha was a citizen of the United States and a resident of and domiciled in the State of Colorado.

11.     The Auraria Higher Education Center ("AHEC") is a state entity responsible for the administration, maintenance, and oversight of Auraria Campus, a shared property that serves as the home to three distinct institutions: The Community College of Denver, Metropolitan State University of Denver, and The University of Colorado Denver.

12.     AHEC manages campus operations, facilities, and policies, including security protocols and coordination with law enforcement agencies.

13.     ACPD is a law enforcement agency responsible for campus security and law enforcement at Auraria Campus.

14.     ACPD was requested by AHEC to engage in law enforcement actions against the protestors.

4

15.     ACPD officers unconstitutionally suppressed free speech by engaging in unlawful arrests, detentions, and violations of the protestors' constitutional rights during the April 26, 2024 protest.

16.     Defendant Jason Mollendor is the Chief of ACPD and is sued in his individual capacity for ordering the unconstitutional dispersal of protestors, directing mass arrests, and failing to ensure proper oversight of ACPD officers.

17.     As Chief of ACPD, Defendant Mollendor is responsible for the training, supervision, and discipline of ACPD officers and worked in coordination with AHEC officials in planning, facilitating, and executing the suppression of the protest.

18.     Defendant Mollendor directly ordered unlawful dispersal and arrests of protestors without probable cause, making him directly responsible for Plaintiffs' unlawful detentions.

19.     ACPD officers established a perimeter around the protestors and were responsible for arresting them and escorting them to a waiting Denver Sheriff's van.

20.     ACPD officers assisted in processing arrestees and handling paperwork and facilitating their transfer to the detention center.

21.     Defendant Corporal Joshua Bode, an officer with ACPD, is sued in his individual capacity for unlawfully arresting and detaining Plaintiff Sarah Napier.

22.     Defendant Officer Corrie Curry, an officer with ACPD, is sued in her individual capacity for unlawfully arresting and detaining Plaintiffs Elowyn Fahnestock and Harriet Falconetti.

23.     Defendant Officer John Gaschler, an officer with ACPD, is sued in his individual capacity for unlawfully arresting and detaining Plaintiff Joie Ha.

5

24.     Defendant Detective Lance Muniz, an officer with ACPD, is sued in his individual capacity for unlawfully arresting and detaining Plaintiffs Alexandria Nickens and Dr. Kyle Montanio.

25.     Defendant Sergeant Eric Martinez, an officer with ACPD, is sued in his individual capacity for unlawfully arresting and detaining Plaintiff Alex Boodrookas.

26.     Defendant Officer Joseph Flageolle, an officer with ACPD, is sued in his individual capacity for unlawfully arresting and detaining Plaintiff Spencer Pajk.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A.  General Allegations Relating to the Protest

27.     Between March 2024 and June 2024, many college campuses across the United States became a fulcrum of protest against Israeli military actions in Gaza.

28.     Students, faculty, and community members called on their local educational institutions to divest from certain financial interests and disclose their investments in Israel.

29.     These protests followed a long tradition of student-led activism in the United States, where university campuses have historically played a pivotal role in challenging government policies and corporate practices.

30.     For example, during the Vietnam War, student demonstrations erupted nationwide on college campuses mobilizing millions against U.S. military involvement, sparking national debates on war, government accountability, and civil liberties.

31.     More recently, in 2020, following the murder of George Floyd, there was a significant surge in Black Lives Matter activism on campuses where students organized protests, teach-ins, and discussions to address systemic racism and advocate for institutional changes.

32.    Against this backdrop and with the spread of similar protests across campuses throughout the country, Auraria Campus, one of the largest urban college campuses in Colorado, became a site for peaceful protest and organized activism against Israeli military actions in Gaza.

33.    On April 25, 2024, unknown individuals erected tents on the Tivoli Quad.

34.    Tivoli Quad is a lawn located east of the Tivoli Student Union Building and is a well-known public forum on campus.



35.    Under Auraria Higher Education Center (AHEC) Policy 3.4.1, Tivoli Quad is designated as an area for "Assembly," which is defined as:

> Any purposeful gathering on Auraria Campus common exterior property by one or more persons whose conduct is peaceful and is in accordance with the law and AHEC rules, policies, and procedures. Assembly includes meetings, speeches, debates, demonstrations, marches, vigils, rallies, protests, and similar meetings or gatherings. For the purposes of this policy, "Assembly" does not include classes, meetings, or events held by AHEC or a Constituent Institution.

36.     This protest on Tivoli Quad urged the three colleges that share the Auraria campus to disclose their investments and research projects related to the Israeli military and to divest from any support.

37.     According to a police report, on April 25, 2024, Skip Speer, General Counsel and Chief Administrative Officer for AHEC, spoke to several unidentified protestors and told them that the tents were in violation of AHEC Policy 7.2.6, which prohibits camping on campus grounds.

38.     Policy 7.2.6 states:

Auraria Campus facilities and grounds shall not be used for camping, regardless of the duration or purpose. Camping is defined as the use of Auraria Campus facilities or grounds for living accommodations or housing purposes, such as overnight sleeping or making preparations for overnight sleeping (including the laying down of bedding for the purpose of sleeping), the making of any fire for cooking, lighting or warmth, or the erection or use of tents, motor vehicles, or other structures for living or shelter. These activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants conducting these activities are intending to use or are using the facilities or grounds for living accommodations or housing, regardless of the duration or other purpose.

39.     AHEC Policy 7.2.6 was enacted on May 18, 2004, following an anti-war protest against the Iraq War at which students set up tents on Auraria Campus.

8



CDTENTCITY—4-9-2003—Theresa Willis, 23, wipes her eyes at dawn while keeping guard over a tent city set up in the middle of the Auraria campus to protest the war in Iraq.
DENVER POST STAFF PHOTO BY GLENN ASAKAWA
(Photo by Glenn Asakawa/The Denver Post via Getty Images)

40.     The timing and context of Policy 7.2.6's adoption indicates that the no-camping policy was designed not as a neutral regulation, but as a tool to restrict expressive conduct and limit speech on campus.

41.     On April 26, 2024, at approximately 12:25 p.m. General Counsel Speer again walked to the encampment and informed a few unidentified individuals that they were violating the camping policy and "needed to leave the Auraria Campus."

42.     Upon information and belief, General Counsel Speer made no attempt to inform all individuals present or to communicate his demand to leave the Auraria Campus more broadly to the assembled protestors.

43.    Nor did General Counsel Speer did inform all individuals present that the tents were an issue or that they could continue their protest if they removed the tents

44.     Upon information and belief, General Counsel Speer did not provide an opportunity for the individuals allegedly responsible for the tents to remove them voluntarily before immediately escalating the situation to police intervention.

45.     Immediately after telling a select few individuals to leave the campus, General Counsel Speer contacted Chief Mollendor from ACPD and told him to remove the individuals present at Tivoli Quad, without distinction between those responsible for the tents and those engaging in constitutionally protected speech.

46.     Two minutes later, at 12:27 p.m., ACPD Chief Jason Mollendor issued a radio transmission declaring the protest "unlawful," stating, "Chief to all units, this group has refused to acknowledge our legal counsel's request to leave. This is now an unlawful protest."

47.     Again, at most, General Counsel Speer only instructed a few unidentified individuals to leave.

48.     At 12:28 p.m., law enforcement officers were ordered by Chief Mollendor to enter Tivoli Quad and initiate enforcement actions against all protestors, irrespective of their individual situations.

49.     At 12:29 p.m. Chief Mollendor approached the protest site and observed individuals peacefully standing with their arms linked.

50.     The protest was peaceful and limited in size, consisting of approximately twenty individuals and a similar number of tents occupying a small portion of Tivoli Quad.



51. As Chief Mollendor approached the tents, Z Williams, a community activist, asked what he intended to do.

52. Chief Mollendor replied that he would issue commands and suggested that people should leave if they did not want to be arrested.

53. Z Williams asked Chief Mollendor if the protesters could move to the sidewalk and away from the tents.

54. This would have allowed law enforcement access to remove the tents without shutting down the protest.

55. Chief Mollendor rejected this option, stating, "They need to leave the campus."

56. Tivoli Quad is a designated public forum intended for expressive activity, a space where individuals are permitted to assemble and engage in protest.

57. The protest was entirely non-violent and did not disrupt campus operations.

58. Other than the few unidentified individuals who had set up tents, none of the protesters had violated any law or campus policy.

59. By refusing to allow protestors to move away from the tents and continue their protest, Chief Mollendor made clear that he was there to shut down the protest rather than simply ensure the remediation of the alleged policy violation.

60.     At 12:30 p.m., Auraria Campus Police Chief Mollendor issued a dispersal order as follows:

> I am Chief Mollendor of the Auraria Campus Police Department. This assembly is in violation of DRMC 38-115 Trespass. You must disperse. Failure to disperse will subject each of you to arrest and prosecution. If you remain, reasonable and necessary force may be used to remove you. The following are routes of dispersal for you to peacefully leave the area: East on Larimer St, North on 11th Street or West on Walnut Street. You have 15 minutes to leave the area. The time is 12:30.

61.     This dispersal order was unlawful and pretextual for numerous reasons, including:

    a.     It did not mention the tents or advise the protestors that the goal of law enforcement was merely to enforce the campus policy regarding tents;

    b.     It failed to instruct demonstrators to remove the tents, instead broadly prohibiting all speech on Auraria campus;

    c.     It did not distinguish between those allegedly violating the camping policy and those engaging in lawful protest;

    d.     It did not allow those engaging in lawful protest to relocate and continue to their protest elsewhere within the Quad, despite the ample space available;

    e.     It cited "trespassing" despite Tivoli Quad being a designated free speech zone.

62.     By issuing an order that effectively banned speech instead of addressing the specific concern regarding tents, law enforcement weaponized campus policy to suppress protected speech.

63.     Following the first dispersal order, Z Williams again approached Chief Mollendor and asked whether legal observers standing on the sidewalk, away from the encampment, would also be subject to arrest under his dispersal order.

64.     Chief Mollendor responded, "Everyone needs to clear the campus," and confirmed that the area was closed to all, including students, journalists, faculty, and legal observers, regardless of their location or role.

65.    Law enforcement officers, clad in riot gear, formed an imposing line facing the students.

66.    Despite the peaceful nature of the protest and the small number of demonstrators, law enforcement arrived in numbers nearly equal to the protesters.



67.    Chief Mollendor issued a second dispersal order at 12:36 p.m.

68.    At 12:38 all of the protestors, standing with their arms linked, sat down.

69.    The unusual law enforcement presence attracted onlookers, some of whom joined the protest in solidarity.

70.    As the number of individuals at the Quad began to grow, the overall volume of chants and slogans rose accordingly.

71.    More law enforcement arrived and began inching closer to the seated protestors.

72.    Chief Mollendor issued two additional dispersal orders at 12:41 p.m. and 12:46 p.m.

13

73.     Given the growing volume and movement, many of the newer arrivals could not hear any of the orders issued by Chief Mollendor.

74.     After the final dispersal order at 12:46 p.m., law enforcement created a police perimeter around the entire encampment and began to arrest the seated protestors.



75.     The crowd at Tivoli Quad continued to grow as more community members became aware of what was happening.

76.     More students, faculty, community members, and even children gathered at the Quad to view the scene and support the protestors.

77.     At 12:55, due to the growing crowd, law enforcement moved and formed a tighter circle around the seated protestors to prevent them from leaving.



78.     Meanwhile, as arrests began, protestors began voluntarily dismantling the tents.

79.     At one point, a male, not part of the seated protestors, used a bullhorn to lead chants.

80.     The chants were, "I don't see a riot here, why are you in riot gear" and "Free Palestine."

81.     Nothing about the chants was threatening, unlawful, or meant to obstruct police activity.

82.     Despite this, Chief Mollendor asked DPD Commander Rebeterano whether they should arrest the man with the bullhorn.

83.     Commander Rebeterano responded, "He's your main agitator, I would say yes."

84.     Commander Rebeterano added: "If you don't remove him from the group, he's going to continue to stay and agitate."

85.     The conversation continued, focusing on identifying and removing so-called "agitators" rather than addressing any legitimate legal violation.

86. At 1:19 p.m., attorney Joey Chase approached Chief Mollendor and asked where a vehicle could be safely parked to assist in the removal of the tents, making it clear that efforts were actively underway to dismantle the encampment.

87. Even though the tents were being actively dismantled, law enforcement continued making arrests.

88. By approximately 1:22 p.m., all of the tents had been completely removed.



89.     Despite the complete removal of tents, which was the only alleged policy violation, law enforcement continued with their arrests.

90.     At approximately 1:21 p.m., Denver Council Member Sarah Parady approached Chief Mollendor and asked if he had any discretion to stop making arrests.

91.     Chief Mollendor stated that "the arrest orders were coming from the campus" and that the decision had already been made and that protesters had "lost their window to leave."

92.     Chief Mollendor's response reveals the pretext of law enforcement's actions because:

a)     If the goal of law enforcement was to enforce campus policy, there was no legal justification for continuing arrests after the tents had been voluntarily removed. Once the alleged policy violation was remedied, all police action should have ceased.

b)     Mollendor's claim that protesters had "lost their window to leave" demonstrates that the dispersal order was not about policy enforcement but about punishment. Imposing a deadline does not transform protected speech into unlawful conduct nor does it create probable cause for arrest.

c)     Mollendor admitted that "the arrest orders were coming from the campus," confirming that the decision to make arrests was driven by institutional directives rather than law enforcement's assessment of policy violations. This is clear from the fact that law enforcement continued to make arrests even after the policy violation was resolved and all the tents had been removed.

d)     Once the tents were removed, the protest was entirely lawful and protected under the First Amendment. The decision to proceed with arrests after the fact demonstrates that the objective was to suppress the protest and retaliate against the protestors.

93.     At 1:30 p.m., additional individuals arrived to participate in the Muslim Friday Prayer which had been scheduled to take place on the Quad.

94.     DPD Officer Smith informed Chief Mollendor that once they finished arresting the "12:30 group," they would need to issue dispersal orders to those arriving for prayer.

17

95. Given that all the tents were removed by this point, there was no lawful basis for ordering the dispersal of the newly arrived individuals.

96. As a direct result of law enforcement's actions, the planned prayer did not occur as intended.

97. None of the Plaintiffs participated in setting up tents, nor did they interfere with law enforcement operations.

98. Rather, Plaintiffs were all arrested solely for engaging in First Amendment protected activity.

99. Plaintiffs were then all transported to the Denver Downtown Detention Center.

100. The mass arrests drew significant media attention and ignited further protests both on the Auraria Campus and throughout the Denver area.

101. Student groups and faculty unions quickly issued statements condemning the arrests, denouncing them as an attack on the rights of peaceful assembly and free expression.

102. On May 24, 2024, during a Citizen Oversight Board meeting, Denver Police Chief Ron Thomas publicly admitted that he had refused to aid AHEC's requests to clear the encampment because "there was no legal way" to do so unless the protest "truly do[es] something that creates an unlawful assembly." He further stated, "We absolutely aren't going to go in and sweep out this peaceful protest just because they're occupying a space on your campus that you'd like to use for something else right now."

103. The arrests and prosecution of Plaintiffs upended their daily lives, disrupted their education and work, and prevented their ability to speak and protest freely about a cause important to them.

104.   Plaintiffs were targeted because of their speech and First Amendment protected activities.

105.   The unlawful dispersal order, encirclement, and continued arrests after the tents were gone illustrate that law enforcement's objective was not policy enforcement but rather retaliation against protestors for their political expression.

106.   These unlawful actions had a pronounced chilling effect on campus, with students and faculty expressing fear of retaliation for engaging in future protests or speaking out on controversial issues because of Plaintiffs' experiences.

107.   The unjustified arrests and detention of Plaintiffs served as a warning to anyone seeking to exercise their constitutional rights, reinforcing a message that protests were not allowed and would be met with arrest.

**B.  Selective and Pretextual Enforcement of the Camping Policy**

108.   Tivoli Quad has long hosted tents, canopies, booths, and temporary structures for various university-sponsored and student-led events without interference or accusations of violating the camping ban.

109.   Tents and structures have been frequently used at Tivoli Quad for cultural festivals, job fairs, fundraising events, and other campus activities—which are not met by the heavy-handed enforcement at issue in this case. For example:

**Abortion debate takes center stage at downtown Denver campus**





Students view the display erected by Justice for All on Denver's Auraria campus



110. Additionally, AHEC Policy 7.2.6 prohibits the use of campus grounds for living accommodations, not the mere presence of tents.

111. The policy defines camping as "the use of Auraria Campus facilities or grounds for living accommodations or housing purposes," which includes overnight sleeping, preparing for sleep, making fires for warmth or cooking, and erecting shelters for habitation.

112. However, law enforcement made no investigation, let alone determination, that the tents were being used for overnight sleeping prior to initiating mass arrests. Rather, law enforcement simply decreed that the temporary tents were unlawful.

113. The tents on Tivoli Quad were not part of a campsite, they were part of the protest itself, serving as a form of symbolic expression to convey a political message.

114. Had campus officials and law enforcement been neutrally enforcing campus policy, they would have investigated whether the tents were being used for sleeping or habitation.

115. Instead, they made no attempt to distinguish between a policy violation and a political demonstration.

116. Their singular focus on declaring the protest unlawful and ordering arrests, rather than directing the removal of the tents, exposed their true intent: to disrupt and dismantle the protest rather than enforce campus rules.

117. The inconsistent enforcement of Policy 7.2.6 further demonstrated the pretextual nature of the arrests.

118. Temporary structures are commonplace on Tivoli Quad and remain in place for extended periods without any law enforcement intervention.

119. The only distinguishing factor on April 26 was that the tents were being used as part of a protest.

120. This content-based enforcement constitutes viewpoint discrimination and violates the First Amendment.

### C. Specific Allegations Relating to Plaintiffs

#### 1. Professor Alex Boodrookas

121. Professor Boodrookas is an assistant professor in the Department of History at Metropolitan State University of Denver (MSU Denver).

122. He teaches World History, Modern Middle East and History of Islam. His areas of expertise are in labor, migration, politics, and the Persian Gulf.

123. He received his Ph.D. in History and Middle Eastern and Islamic Studies and his master's degree in Near Eastern Studies from New York University.

124. He received his bachelor's degree in history and American Studies from George Washington University.

125. On Friday, April 26, 2024, Prof. Boodrookas arrived at Auraria Campus at approximately 8:00 a.m.

21

126. He spent the morning working on his current book project in his temporary office located next to the Tivoli Quad.

127. At around noon, he walked to a nearby building to participate in a faculty union meeting conducted over Zoom, which lasted until approximately 12:30 p.m.

128. While walking from his office to the faculty meeting, Prof. Boodrookas noticed an increased police presence on campus.

129. After the faculty meeting concluded, Prof. Boodrookas walked by the Tivoli Quad on his way back to his office.

130. At the Quad he observed a line of students standing with arms linked engaged in protest, facing a line of police.

131. The students were peaceful and orderly with some holding signs and engaging in political chants.

132. They were not disrupting campus operations or student learning.

133. Prof. Boodrookas and two other faculty members who were at the meeting decided to support the protesters by joining the line in which they were standing.

134. After linking arms with the protestors, Dr. Boodrookas encouraged everyone to sit down in order to de-escalate the situation.

135. Dr. Boodrookas did not hear any dispersal orders.

136. Within a few minutes of being seated, law enforcement surrounded the line of seated protestors and began to individually arrest the seated individuals.

137. Once the police encircled the seated protestors, it was clear to Prof. Boodrookas that he was not free to get up and leave.

138. By the time Prof. Boodrookas was arrested all the tents behind him had been removed.

139. Prof. Boodrookas was charged with trespass and failure to obey a lawful order.

140. His charges were dismissed by the Denver City Attorney's Office on October 14, 2024 on ground that the City did not believe there was a "reasonable likelihood of conviction" in the case.

### 2. Professor Kyle Montanio

141. Professor Kyle Montanio is a professor of economics at the College of Liberal Arts and Sciences at the University of Colorado Denver (UC Denver).

142. Prof. Montanio teaches several courses, including Principles of Microeconomics, Introduction to Statistics, Environmental Economics, Natural Resource Economics, Econometrics, Economics of Growth, and Development Economics.

143. His primary areas of expertise are environmental economics and natural resource economics, as well as the pedagogy of economics.

144. Prof. Montanio earned his Ph.D. in Environmental and Natural Resource Economics from the University of Rhode Island in 2017 and holds a Bachelor's Degree in Economics and Psychology from Virginia Tech, which he obtained in 2010.

145. On Friday, April 26, 2024, Prof. Montanio spent the morning at his campus office at the economics department at UC Denver located at 1380 Lawrence St., Suite 470, grading final projects to wrap up the semester.

146. While eating lunch at his office he received emails from the school about a student protest starting at Tivoli Quad.

147.    Concerned about the potential for police crackdowns similar to those he had read about on other campuses, Prof. Montanio decided to walk over to the Quad and check on the welfare of the students.

148.    Upon his arrival at Tivoli Quad, Prof. Montanio saw a group of students standing together.

149.    He approached them to see how they were doing.

150.    Before he could have a meaningful conversation with anyone, the police started to arrive on Tivoli Quad.

151.    In response to police presence, the students peacefully linked arms.

152.    Prof. Montanio, to support the students and their right to protest, joined them.

153.    Once the protesters sat down, law enforcement surrounded them, forming a restrictive perimeter.

154.    At that point Prof. Montanio knew that he was not free to get up and leave.

155.    He was subsequently placed under arrest and charged with trespass and failure to obey a lawful order.

156.    Prof. Montanio entered into a deferred prosecution agreement with the City Attorney's Office for the dismissal of his charges.

### 3.    Harriett Falconetti

157.    Henry Falconetti (hereinafter "Hariet Falconetti" or "Harriet") is a third-year political science student at the University of Colorado Denver (UC Denver), where she has been enrolled since August 2022.

158.    Ms. Falconetti is also the news editor for UC Denver's student newspaper, The Sentry.

159.    She receives a stipend of $2,000 per semester for her work as the news editor.

160.    Throughout her tenure at The Sentry, Ms. Falconetti has covered several protests on campus.

161.    On the morning of Friday, April 26, 2024, Ms. Falconetti arrived on Auraria Campus to cover the protest on the Tivoli Quad for The Sentry.

162.    She carried a camera around her neck and took pictures throughout the morning.

163.    Ms. Falconetti saw the protestors sitting on the grass in a line and she moved around them taking photographs.

164.    Several law enforcement officials witnessed her taking photographs.

165.    At approximately 1:30 p.m., people formed a circle around the police.

166.    Ms. Falconetti moved close to the circle so she could have an unobstructed view in order to take photographs.

167.    At one point, Ms. Falconetti put her camera away in her bag.

168.    She then joined the people forming a circle around law enforcement.

169.    Within minutes of joining the circle, Ms. Falconetti was suddenly pushed to the ground by law enforcement.

170.    Before she could stand up, law enforcement surrounded her.

171.    Officer Curry placed her knee or foot on Ms. Falconetti's back and pinned her to the ground, and handcuffed and arrested her.

172.    Ms. Falconetti was charged with trespass and failure to obey a lawful order, despite never having been issued any orders by law enforcement.

173.    Her charges were dismissed by the Denver City Attorney's Office on September 4, 2024.

### 4.    Elowyn Fahnestock

174.    Ms. Elowyn Fahnestock is a Colorado native.

175.    On Friday, April 26, 2024, she arrived at Tivoli Quad around 11:30 a.m., intending to relax on the lawn. She sat in the sun drinking a soda and reading on her phone.

176.    Around 12:00 p.m., she noticed a growing police presence at the Quad and saw a line of individuals, whom she assumed were students, linking arms and facing law enforcement.

177.    Disturbed that law enforcement had been deployed against peaceful demonstrators, Ms. Fahnestock decided to join the line in solidarity with the protestors.

178.    Not long after the group sat down, law enforcement surrounded the protestors, preventing their exit, and began arresting them one by one.

179.    By the time officers arrested Ms. Fahnestock, all of the tents behind her had already been removed.

180.    Ms. Fahnestock was charged with trespass and failure to obey a lawful order.

181.    Ms. Fahnestock entered into a deferred prosecution agreement with the City Attorney's Office for dismissal of her charges.

### 5.    Alexandria Nickens

182.    Alexandria Nickens is a graduate student at CU Denver pursuing a Master's in Public Administration with a concentration in Social Equity.

183.    On Friday, April 26, 2024, she was working from home when she saw messages on Signal regarding heavy police presence on campus.

184.    Ms. Nickens, aware of the police response to nationwide student protests, was concerned about the rights and safety of her friends and decided to drive to Auraria Campus.

185.    When Ms. Nickens arrived at Tivoli Quad at approximately 12:40 p.m., she saw many of her friends sitting on the ground with their arms linked, facing a line of law enforcement officers in full riot gear.

186.    At approximately 12:45 p.m., Ms. Nickens joined the seated protesters to support her friends and their right to peacefully demonstrate.

187.    She linked arms with those around her, standing in solidarity with the movement.

188.    Ms. Nickens did not hear any dispersal announcements from law enforcement.

189.    Within minutes of being seated, law enforcement encircled the group and began arresting them one by one.

190.    Once encircled by officers, Ms. Nickens realized she could no longer leave.

191.    Ms. Nickens sat in the line surrounded by police for over two hours. She was arrested at approximately 2:30 p.m.

192.    By the time she was arrested, the encampment behind her had been completely dismantled.

193.    Ms. Nickens was charged with trespass and failure to obey a lawful order.

194.    Her charges were dismissed by the Denver City Attorney's Office on August 20, 2024.

### 6.    Spencer Pajk

195.    Mr. Spencer Pajk is a Denver resident who lives near Auraria campus.

196.    On April 26, 2025, Mr. Pajk biked to Tivoli Quad at around 1:00 expecting to participate in the protest with friends who attend school at Auraria campus.

197.    Upon arrival, Mr. Pajk observed a heavy police presence with dozens of officers and squad vehicles facing off with students.

198.    Curious about the situation, Mr. Pajk asked someone in the crowd what was happening.

199.    A bystander told him that police were arresting the seated protestors.

200.    A crowd had gathered to support the individuals sitting on the ground and Mr. Pajk joined the crowd.

201.    Within minutes, law enforcement officers approached Mr. Pajk and forcefully grabbed him along with the individual next to him.

202.    Mr. Pajk was arrested, booked, and placed on a jail bus, despite having been on campus for no more than 10 to 20 minutes and not having been issued any orders to leave by law enforcement.

203.    Mr. Pajk was charged with trespass and failure to obey a lawful order.

204.    Mr. Pajk entered into a deferred prosecution agreement with the City Attorney's Office for dismissal of his charges.

**7.    Joie Ha**

205.    Ms. Joie Ha is a lecturer in Ethnic Studies at CU Denver, teaching for the CU Succeed program.

206.    On April 26, 2024, Ms. Ha saw messages on a Slack chat by individuals requesting help in removing the tents from Tivoli Quad.

207.    Ms. Ha arrived at the Quad around 1:15 p.m. and immediately began assisting individuals who were already in the process of dismantling the tents.

208.    Once the tents were fully removed, Ms. Ha joined the crowd that had gathered to support the individuals sitting on the ground.

209.    Law enforcement never issued a dispersal order while Ms. Ha was at the Quad.

210.    Around 2:00 p.m., without warning, four officers grabbed Ms. Ha and two students standing next to her, violently pulling them to the ground.

211.    Because their arms were linked, there was a struggle as law enforcement forcibly separated them.

212.    Rather than instructing Ms. Ha to stand, four officers each grabbed one of her limbs and dragged her across the ground before taking her into custody.

213.    Ms. Ha was charged with interference and failure to obey a lawful order.

214.    Ms. Ha entered into a deferred prosecution agreement with the City Attorney's Office for dismissal of her charges.

### 8.    Sarah Napier

215.    Sarah Napier is a graduate of the University of Colorado Boulder, where she earned her degree in Dance and Neuroscience in May 2023.

216.    On April 26, 2024, Ms. Napier arrived at Auraria Campus at approximately 10:30 a.m. to participate in the protest.

217.    At approximately 12:30 p.m., law enforcement arrived at Tivoli Quad and issued dispersal orders.

218.    Ms. Napier joined her fellow protestors and linked arms.

219.    She was seated on the ground when officers began arresting each of the protestors one by one.

220.    By the time Ms. Napier was arrested at approximately 1:45 p.m., all of the tents had been removed.

221.    Ms. Napier was charged with trespass and failure to obey.

222. Her charges were dismissed by the Denver City Attorney's Office on October 21, 2024 "in the interests of justice."

## V. <u>STATEMENT OF CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### Colorado Constitution Art. II, Section 10
### C.R.S. § 13-21-131 Freedom of Speech
### (Against all Defendants)

223. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

224. The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

225. The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those enshrined in the First Amendment to the United States Constitution.

226. Defendants are "peace officers" and therefore subject to C.R.S. § 13-21-131.

227. Defendants were acting within the course and scope of their employment as law enforcement officers for ACPD when they engaged in the unlawful conduct alleged herein.

228. Plaintiffs engaged in protected speech at Tivoli Quad, a designated public forum.

229. Plaintiffs' protected speech did not violate any law.

230. Defendants' actions, including the unlawful dispersal order, arbitrary arrests, and suppression of speech, violated Plaintiffs' state constitutional rights.

30

231.   Defendants shut down the protest entirely rather than enforcing a specific policy regarding the tents.

232.   Defendants continued to arrest protesters even after the tents were removed, revealing that their goal was not enforcing campus policy but suppressing speech.

233.   Defendants' actions were not a valid time, place, or manner restriction under Colorado law and were instead a pretext for censorship.

234.   Defendants' actions were motivated by the content and viewpoint of Plaintiffs' speech, not by any legitimate law enforcement objective.

235.   Defendants' actions were taken intentionally, willfully, and maliciously to deter future protests and punish those advocating for political change.

236.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

**SECOND CLAIM FOR RELIEF**
**Colorado Constitution Art. II, Section 24**
**C.R.S. § 13-21-131 – Right to Assemble and Petition**
**(Against All Defendants)**

237.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

238.   The Assembly and Petition Clause to the Colorado Constitution provides that "[t]he people have the right peaceably to assemble for the common good, and to apply to those

31

invested with the powers of government for redress of grievances, by petition or remonstrance." Colo. Const. Art. II, Section 24.

239.    The rights protected by Colo. Const. Art. II, Section 24 are more expansive than those protected by the First Amendment to the United States Constitution.

240.    Defendants are "peace officers" and therefore subject to C.R.S. § 13-21-131.

241.    Defendants were acting within the course and scope of their employment as law enforcement officers for ACPD when they engaged in the unlawful conduct alleged herein.

242.    Plaintiffs engaged in assembly and petitioning activity at Tivoli Quad, a designated public forum.

243.    Plaintiffs' assembly and petitioning activity did not violate any law.

244.    Defendants' actions, including the unlawful dispersal order, arbitrary arrests, and suppression of speech, violated Plaintiffs' state constitutional rights.

245.    Defendants shut down the protest entirely rather than enforcing any policy regarding the tents.

246.    Defendants continued to arrest protesters even after the tents were removed, revealing that their goal was not enforcing campus policy but suppressing speech.

247.    Defendants' actions were not a valid time, place, or manner restriction under Colorado law and were instead a pretext for censorship.

248.    Defendants' actions were motivated by the content and viewpoint of Plaintiffs' speech, not by any legitimate law enforcement objective.

249.    Defendants' actions were taken intentionally, willfully, and maliciously to deter future protests and punish those advocating for political change.

32

250.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

**THIRD CLAIM FOR RELIEF**
**Colorado Constitution Art. II, Section 7**
**C.R.S. § 13-21-131 – Unlawful Seizure**
**(Against All Defendants)**

251.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

252.    Article II, Section 7 of the Colorado Constitution prohibits unreasonable searches and seizures.

253.    The rights afforded through Article II, § 7 of the Constitution of the State of Colorado afford broader protections than those by the Fourth Amendment of the U.S. Constitution. *See, e.g., People v. McKnight*, 446 P.3d 397, 408 (Colo. 2019).

254.    Defendants are "peace officers" and therefore subject to C.R.S. § 13-21-131.

255.    Defendants were acting within the course and scope of their employment as law enforcement officers for ACPD when they engaged in the unlawful conduct alleged herein.

256.    Defendants seized and arrested Plaintiffs without probable cause, violating their Colorado Constitutional rights.

257.    Defendants first formed a perimeter around the Plaintiffs, unlawfully and unreasonably trapping and seizing them for several hours.

33

258.    No facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable person to believe that Plaintiffs had committed or were committing an offense.

259.    Plaintiffs were not a threat to anyone's safety or security, nor had they interfered or obstructed Defendants in any way.

260.    Defendants' only articulable reason for their presence on Tivoli Quad on April 26 was that there was a campus policy violation regarding the erection of tents.

261.    However, Defendants made no effort to discern whether Plaintiffs were responsible for the policy violation.

262.    Additionally, law enforcement maintained their perimeter and entrapped the Plaintiffs even after the tents had already been removed and the policy violation had thus been resolved.

263.    Defendants' conduct was objectively unreasonable and motivated by political suppression rather than legitimate law enforcement interests.

264.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

**FOURTH CLAIM FOR RELIEF**
**Colorado Constitution Art. II, Section 7**
**C.R.S. § 13-21-131 – Unlawful Arrest**
**(Against All Defendants)**

265.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

266.    Article II, Section 7 of the Colorado Constitution protects the right to be free from unreasonable searches and seizures.

267.    To comply with the constitutional provisions, formal arrests (seizures) must be supported by probable cause. *People v. King*, 16 P.3d 807, 812 (Colo. 2001).

268.    The rights afforded through Article II, § 7 of the Constitution of the State of Colorado afford broader protections than those by the Fourth Amendment of the U.S. Constitution. *See, e.g., People v. McKnight*, 446 P.3d 397, 406-407 (Colo. 2019).

269.    Defendants are "peace officers" and therefore subject to C.R.S. § 13-21-131.

270.    Defendants were acting within the course and scope of their employment as law enforcement officers for ACPD when they engaged in the unlawful conduct alleged herein.

271.    Defendants arrested Plaintiffs with no reasonable suspicion or arguable probable cause that they had or were committing any crime.

272.    No facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable person to believe that Plaintiffs had committed or were committing an offense.

273.    Plaintiffs were not a threat to anyone's safety or security, nor had they interfered or obstructed Defendants in any way.

274.    Defendants' only articulable reason for their presence on Tivoli Quad on April 26 was that there was a campus policy violation regarding the erection of tents.

275.    However, Defendants made no effort to discern whether Plaintiffs were responsible for the policy violation.

35

276.    Additionally, all Plaintiffs were arrested after the tents had already been removed and the policy violation had thus been resolved.

277.    Defendants' conduct was objectively unreasonable and motivated by political suppression rather than legitimate law enforcement interests.

278.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Violation of the First Amendment – Freedom of Speech and Assembly**
**(Against all Defendants)**

279.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set herein.

280.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

281.    At all relevant times, Defendants acted under color of state law and within the course and scope of their employment as law enforcement officers or officials at Auraria Campus.

282.    Plaintiffs engaged in First Amendment protected expression by participating in the April 26, 2024 protest at Tivoli Quad

283.    Plaintiffs' expression occurred in a public forum specifically designated for expressive activity.

284.    Plaintiffs' expression was on a matter of public concern and Plaintiffs did not violate any law.

285. Defendant Mollendor's dispersal order unlawfully criminalized protected speech, failing to distinguish between those allegedly violating campus policy and those engaging in peaceful protest.

286. Rather than directing protesters to move aside to allow officers to remove the tents (which they offered to do), Defendants issued a blanket dispersal order banning all expressive activity from Tivoli Quad entirely.

287. Defendants' actions were motivated by the content and viewpoint of Plaintiffs' speech, not by any legitimate law enforcement objective.

288. Defendants' stated justification for the arrests – to remove the encampment – was pretextual as they continued arresting individuals even after the tents were voluntarily removed.

289. Defendants' actions were not a reasonable time, place, and manner restriction on speech and were instead an unlawful and pretextual effort to silence political expression.

290. Plaintiffs had a clearly established constitutional right under the First Amendment to the United States Constitution to assemble and to speak out on political issues. Any reasonable law enforcement officer knew or should have known of this clearly established right.

291. Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

292. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

## SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Retaliation
### (Against All Defendants)

293.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

294.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

295.    Defendants acted under color of state law at all relevant times.

296.    Plaintiffs engaged in protected First Amendment activity, including peaceful protest, expressive conduct, and assembly in a designated public forum.

297.    Defendants arrested Plaintiffs not because of any lawful basis, but in retaliation for their expressive activities.

298.    The timing of the arrests, continuing even after the tents were removed, demonstrates that the true purpose was to punish Plaintiffs for their speech.

299.    Defendants selectively enforced their dispersal order and arrests, allowing some individuals to remain while specifically targeting others for their political expression.

300.    Defendants' unlawful actions would chill a person of ordinary firmness from engaging in future First Amendment activities.

301.    By unlawfully arresting Plaintiffs, Defendants sought to punish them for exercising their First Amendment rights, to silence them, and to deter them from gathering and speaking in the future.

302.    Plaintiffs had a clearly established right under the First Amendment to be free from retaliation. Any reasonable officer knew or should have known of this clearly established right.

303. Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights, and is therefore liable to Plaintiffs for punitive damages.

304. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

305. Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth and Fourteenth Amendment – Unlawful Seizure**
**(Against All Defendants)**

306. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

307. Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

308. Defendants acted under color of state law and within the scope of their employment at all relevant times.

309. At all relevant times, Plaintiffs had a clearly established right under the Fourth and Fourteenth Amendments to be free from unreasonable seizure and arrest without probable cause.

310. Defendants seized and arrested Plaintiffs without probable cause.

311.    Defendants first formed a perimeter around the Plaintiffs, unlawfully and unreasonably trapping and seizing them for several hours.

312.    No facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable person to believe that Plaintiffs had committed or were committing an offense.

313.    Plaintiffs were not a threat to anyone's safety or security, nor had they interfered or obstructed Defendants in any way.

314.    Defendants' only articulable reason for their presence on Tivoli Quad on April 26 was that there was a campus policy violation regarding the erection of tents.

315.    However, Defendants made no effort to discern whether Plaintiffs were responsible for the policy violation.

316.    Additionally, law enforcement maintained their perimeter and entrapped the Plaintiffs even after the tents had already been removed and the policy violation had thus been resolved.

317.    Defendants' conduct was objectively unreasonable and motivated by political suppression rather than legitimate law enforcement interests.

318.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

319. Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

**EIGHTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Due Process**
**(Against All Defendant)**

320. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

321. Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

322. Defendants acted under color of state law and within the scope of their employment at all relevant times.

323. At all relevant times, Plaintiffs had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to due process before being deprived of their liberty. Any reasonable law enforcement officer knew or should have known of this clearly established right.

324. Defendant Mollendor issued an unlawful, vague and pretextual dispersal order that failed to:

    a. Specify an actual legal violation: The order did not inform demonstrators that the alleged policy violation concerned the presence of tents but instead labeled the entire protest unlawful.

    b. Provide clear instructions for compliance: Protesters were not instructed to remove the tents, relocate to another area, or take any action to avoid arrest. Instead, the order banned them from the entire campus, despite Tivoli Quad being a designated public forum.

    c. Differentiate between individuals engaged in protected speech and those who had set up tents: Protesters who were lawfully exercising their First Amendment rights were treated as trespassers and subject to arrest without

41

distinction.

d. Provide notice to all affected individuals: Many demonstrators, including those arriving after the order, never heard a dispersal order before they were arrested.

325. The dispersal order issued by Defendant Mollendor failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct was prohibited and encouraged arbitrary and discriminatory enforcement.

326. Even after the alleged policy violation (the tents) had been completely remedied, law enforcement continued to make arrests, confirming that the objective was not compliance with policy but rather the punishment of political expression.

327. In response to Denver Council Member Sarah Parady's inquiry about stopping arrests, Defendant Mollendor admitted that the decision to continue arrests had already been made and that protesters had "lost their window to leave."

328. This underscores that compliance with the supposed policy violation was never the goal and arrests were predetermined regardless of any demonstrators' actions.

329. Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

330. The unlawful dispersal order and arbitrary arrests deprived Plaintiffs of their liberty without due process of law, in violation of the Fourteenth Amendment to the U.S. Constitution.

331. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and

anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

332.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## NINTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment - Malicious Prosecution
### (Against All Defendants)

333.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

334.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

335.    Defendants acted under color of state law and within the scope of their employment at all relevant times.

336.    Defendants arrested Plaintiffs with no reasonable suspicion or arguable probable cause that they had or were committing any crime.

337.    No facts and circumstances within Defendants' knowledge were sufficient to warrant a reasonable person to believe that Plaintiffs had committed or were committing an offense.

338.    Plaintiffs were not a threat to anyone's safety or security, nor had they interfered or obstructed Defendants in any way.

339.    Defendants' only articulable reason for their presence on Tivoli Quad on April 26 was that there was a campus policy violation regarding the erection of tents.

340.    However, Defendants made no effort to discern whether Plaintiffs were responsible for the policy violation.

341.    Additionally, all Plaintiffs were arrested after the tents had already been removed and the policy violation had thus been resolved.

342.    Defendants' conduct was objectively unreasonable and motivated by political suppression rather than legitimate law enforcement interests.

343.    Defendants acted with malice in initiating the charges against Plaintiffs and causing their continued prosecution.

344.    Defendants engaged in the above actions and omissions knowingly, maliciously, willfully and wantonly.

345.    Defendants' conduct violated clearly established rights belonging to Plaintiffs of which a reasonable person in their positions knew or should have known.

346.    The criminal charges brought against Plaintiffs were ultimately dismissed.

347.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the protest, and other compensatory and special damages.

348.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

a)  Economic damages;

b)  Compensatory damages for Plaintiffs for the violations of their constitutional rights, pain and suffering, and other injuries;

c)  Punitive damages;

d)  An award of attorneys' fees and costs;

e)  Pre- and post-judgment interest as permitted by law;

f)  Such other and further relief as the Court may deem just and proper.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: April 9, 2025

RATHOD | MOHAMEDBHAI LLC

*s/ Azra Taslimi*
Azra Taslimi
Matthew J. Cron
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (phone)
(303) 578-4401 (facsimile)
at@rmlawyers.com
mc@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS