IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 25-cv-01509-PAB-KAS

ALEX BOODROOKAS, et al.,

    Plaintiffs,

v.

JASON MOLLENDOR, Police Chief; in his individual capacity, et al.,

    Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendants' Motion to Dismiss [Docket No. 31]. Plaintiffs filed a response. Docket No. 45. Defendants filed a reply. Docket No. 58. The Court has jurisdiction under 28 U.S.C. § 1331.

## I.    FACTS[1]

Auraria Campus is a shared property in Denver, Colorado that houses three universities: The Community College of Denver, Metropolitan State University of Denver, and the University of Colorado Denver. Docket No. 20 at 4, ¶ 12. Tivoli Quad, located on Auraria Campus, is a lawn located east of the Tivoli Student Union Building and is a "well-known public forum on campus." *Id.* at 7, ¶ 36. Under Auraria Higher Education Center ("AHEC") Policy 3.4.1, Tivoli Quad is designated as an area for "Assembly," which is defined as:

---

[1] The facts below are taken from plaintiffs' amended complaint, Docket No. 20, and are presumed to be true, unless otherwise noted, for purpose of ruling on the motion to dismiss.

> Any purposeful gathering on Auraria Campus common exterior property by one or more persons whose conduct is peaceful and is in accordance with the law and AHEC rules, policies, and procedures.  Assembly includes meetings, speeches, debates, demonstrations, marches, vigils, rallies, protests, and similar meetings or gatherings.  For the purposes of this policy, "Assembly" does not include classes, meetings, or events held by AHEC or a Constituent Institution.

*Id.* at 8, ¶ 37.

On April 25, 2024, unknown individuals erected tents on Tivoli Quad.  *Id*. at 7, ¶ 35.  This "protest" on Tivoli Quad "urged the three colleges that share the Auraria campus to disclose their investments and research projects related to the Israeli military and to divest from any support."  *Id.* at 8, ¶ 38.  Skip Speer, General Counsel and Chief Administrative Officer for AHEC, spoke to several unidentified individuals and told them that the tents violated AHEC Policy 7.2.6, which prohibits camping on campus grounds.  *Id.*, ¶ 39.  Policy 7.2.6 states:

> Auraria Campus facilities and grounds shall not be used for camping, regardless of the duration or purpose.  Camping is defined as the use of Auraria Campus facilities or grounds for living accommodations or housing purposes, such as overnight sleeping or making preparations for overnight sleeping (including the laying down of bedding for the purpose of sleeping), the making of any fire for cooking, lighting or warmth, or the erection or use of tents, motor vehicles, or other structures for living or shelter.  These activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants conducting these activities are intending to use or are using the facilities or grounds for living accommodations or housing, regardless of the duration or other purpose.

*Id.* at 9, ¶ 40.  Policy 7.2.6 (the "Encampment Policy") was enacted on May 18, 2004, following an anti-war protest against the Iraq War where students set up tents on Auraria Campus.  *Id.*, ¶ 41.  Tivoli Quad has long hosted tents, canopies, booths, and temporary structures for various university-sponsored and student-led events without interference or accusations of violating the Encampment Policy.  *Id.* at 20, ¶ 110.

2

On April 26, 2024, at approximately 12:25 p.m., General Counsel Speer again walked to the encampment on Tivoli Quad and informed a few unidentified individuals that they were violating the Encampment Policy and that they "needed to leave the Auraria Campus." *Id.* at 10, ¶ 43. General Counsel Speer made no attempt to inform all individuals present or to communicate his demand to leave Auraria Campus more broadly to the assembled protesters. *Id.*, ¶ 44. General Counsel Speer did not inform all individuals present that the tents were an issue or that they could continue their protest if they removed their tents. *Id.*, ¶ 45. Immediately after telling a select few individuals to leave the campus, General Counsel Speer contacted defendant Jason Mollendor, Chief of the Auraria Campus Police Department ("ACPD"). *Id.* at 5, 10, ¶¶ 17, 47. General Counsel Speer told Chief Mollendor to remove individuals present at Tivoli Quad. *Id.* at 10, ¶ 47.

At 12:27 p.m., Chief Mollendor issued a radio transmission declaring the protest "unlawful," stating "Chief to all units, this group has refused to acknowledge our legal counsel's request to leave. This is now an unlawful protest." *Id.*, ¶ 48. At 12:28 p.m., Chief Mollendor told law enforcement officers to enter Tivoli Quad and initiate enforcement actions against all protesters. *Id.* at 11, ¶ 50. At 12:29 p.m., Chief Mollendor approached the protest site and observed individuals peacefully standing with their arms linked. *Id.*, ¶ 51. The protest consisted of approximately 20 individuals and a "similar number of tents occupying a small portion of Tivoli Quad." *Id.*, ¶ 52. The protest was non-violent and did not disrupt campus operations. *Id.* at 12, ¶ 59. As Chief Mollendor approached the tents, Z Williams, a community activist, asked Chief Mollendor what he intended to do. *Id* at 11, ¶ 53. Chief Mollendor replied that he would

3

issue commands and suggested that people should leave if they did not want to be arrested. *Id.*, ¶ 54. Z Williams asked Chief Mollendor if the protesters could move to the sidewalk and away from the tents. *Id.*, ¶ 55. Chief Mollendor responded, "[t]hey need to leave the campus." *Id.* at 12, ¶ 57.

At 12:30 p.m., Chief Mollendor issued the following dispersal order:

I am Chief Mollendor of the Auraria Campus Police Department. This assembly is in violation of DRMC 38-115 Trespass.[2] You must disperse. Failure to

---

[2] Den. Rev. Mun. Code § 38-115 provides:

(a) It is unlawful for any person knowingly to enter or remain upon the premises of another when consent to enter or remain is absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof.

(b) It shall be prima facie evidence that consent is absent, denied, or withdrawn, to enter or remain upon the premises of another when:

(1) Any person fails or refuses to remove himself from said premises when requested to leave by the owner, occupant or person having lawful control thereof; or

(2) Such premises are fenced or otherwise enclosed in a manner designed to exclude intruders; or

(3) Private property or public property, which is not then open to the public, is posted with signs which give notice that entrance is forbidden.

(c) For purpose of subsection (b)(3):

(1) A "conspicuous sign" shall mean a sign that is at least one (1) square foot in size and sufficiently lighted to be clear and visible and that is posted in a conspicuous location.

(2) "Sufficient notice" that entrance is forbidden shall be established when the lettering on a conspicuous sign is at least one (1) inch in height and contains language that is substantially similar to the following: "Private property: Keep out . . . . Violators subject to arrest" or "Private property …. Violators subject to arrest between the hours of _____ and _____."

disperse will subject each of you to arrest and prosecution.  If you remain, reasonable and necessary force may be used to remove you.  The following are routes of dispersal for you to peacefully leave the area: East on Larimer St, North on 11th Street or West on Walnut Street.  You have 15 minutes to leave the area. The time is 12:30.

*Id.*, ¶ 62.  Following issuance of the order, Z Williams approached Chief Mollendor.  *Id.* at 13, ¶ 65.  Z Wiliams asked whether legal observers standing on the sidewalk, away from the encampment, were subject to arrest under his dispersal order.  *Id.*  Chief Mollendor responded, "[e]veryone needs to clear the campus."  *Id.*  Law enforcement officers, clad in riot gear, formed a line facing the students.  *Id.*, ¶ 67.  There were nearly an equal number of law enforcement officers and protesters.  *Id.*, ¶ 68.

At 12:36 p.m., Chief Mollendor issued a second dispersal order.  *Id.* at 14, ¶ 69. At 12:38 p.m., all of the protesters linked arms and sat down.  *Id.*, ¶ 70.  The activity attracted onlookers, some of whom joined the protest in solidarity.  *Id.*, ¶ 71.  As more individuals arrived at Tivoli Quad, the overall volume of chants and slogans grew accordingly.  *Id.*, ¶ 72.  More law enforcement officers arrived and began inching closer to the seated protesters.  *Id.*, ¶ 73.

Chief Mollendor issued two additional dispersal orders, one at 12:41 p.m. and another at 12:46 p.m.  *Id.*, ¶ 74.  Given the growing volume and movement, many of the newer arrivals to the protests could not hear any of the orders issued by Chief

---

(d) If any provision of subsection (a), (b) or (c) is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the subsection are valid, unless it appears to the court that the valid provisions of the subsection are so essentially and inseparably connected with, and so dependent upon, the void provisions that it cannot be presumed city council would have enacted the valid provisions without the void one, or unless the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Mollendor. *Id.*, ¶ 75. After the final dispersal order at 12:46 p.m., law enforcement created a perimeter around the entire encampment and began to arrest the seated protesters. *Id.* at 15, ¶ 76. The crowd at Tivoli Quad continued to grow as more community members became aware of what was happening. *Id.*, ¶ 77. At 12:55 p.m., due to the growing crowd, law enforcement moved and formed a tighter circle around the seated protesters to prevent them from leaving. *Id*, ¶ 79.

Meanwhile, as the arrests began, protesters began voluntarily dismantling the tents. *Id.* at 16, ¶ 80. At one point a male, who was not part of the seated protesters, used a bullhorn to lead chants. *Id.*, ¶ 81. The chants stated, "I don't see a riot here, why are you in riot gear" and "Free Palestine." *Id.*, ¶ 82. At 1:19 p.m., attorney Joey Chase approached Chief Mollendor and asked whether a vehicle could be safely parked to assist in the removal of the tents. *Id.* at 17, ¶ 88. While the tents were being dismantled, law enforcement continued making arrests. *Id.*, ¶ 89. By approximately 1:22 p.m., all of the tents had been completely removed. *Id.*, ¶ 90. Despite the removal of all the tents, law enforcement continued making arrests. *Id.* at 18, ¶ 91. At approximately 1:21 p.m., Denver City Council Member Sarah Parady approached Chief Mollendor and asked if he had any discretion to stop making arrests. *Id.*, ¶ 92. Chief Mollendor responded that "the arrest orders were coming from the campus," that the decision had already been made, and that protesters had "lost their window to leave." *Id.*, ¶ 93.

At 1:30 p.m., individuals arrived at Tivoli Quad to participate in the Muslim Friday Prayer. *Id.*, ¶ 95. A law enforcement officer told Chief Mollendor that, once they

finished arresting the "12:30 group," they would need to issue dispersal orders to those arriving for the prayer.  *Id.* at 19, ¶ 96.

### A. <u>Professor Alex Boodrookas</u>

Plaintiff Alex Boodrookas is an assistant professor in the Department of History at Metropolitan State University of Denver ("MSU Denver).  *Id.* at 22, ¶ 123.  On April 26, 2024, Professor Boodrookas was leaving a faculty meeting and walked by Tivoli Quad.  *Id.* at 23, ¶¶ 130-131.  Professor Boodrookas observed a line of students standing with arms linked at Tivoli Quad, facing a line of police.  *Id.*, ¶ 132.  Professor Boodrookas and two other faculty members at the meeting decided to support the protesters by joining the line in which the protesters were standing.  *Id.*, ¶ 135.  After linking arms with the protesters, Professor Boodrookas encouraged everyone to sit down to de-escalate the situation.  *Id.*, ¶ 136.  Professor Boodrookas did not hear any dispersal orders.  *Id.*, ¶ 137.  By the time Professor Boodrookas was arrested, all the tents had been removed.  *Id.* at 24, ¶ 140.  Professor Boodrookas was charged with trespass and failure to obey a lawful order.  *Id.*, ¶ 141.  The charges against Professor Boodrookas were dismissed by the Denver City Attorney's Office on the grounds that the City did not believe there was a "reasonable likelihood of conviction" in the case.  *Id.*, ¶ 142.  Defendant ACPD Sergeant Eric Martinez is the officer who arrested and detained Professor Bookdrookas.  *Id.* at 6, ¶ 26.

### B. <u>Professor Kyle Montanio</u>

Plaintiff Kyle Montanio is a professor of economics at the College of Liberal Arts and Sciences at the University of Colorado Denver ("UC Denver").  *Id.* at 24, ¶ 143.  While eating lunch in his office, Professor Montanio received an email stating that a

student protest was starting at Tivoli Quad. *Id.* at 25, ¶ 148. Professor Montanio walked over to Tivoli Quad to check on the welfare of the students. *Id.*, ¶ 149. Upon arriving at Tivoli Quad, Professor Montanio saw a group of students standing together and approached them. *Id.*, ¶¶ 150-51. Before Professor Montanio could engage in a "meaningful conversation with anyone," police started to arrive on Tivoli Quad. *Id.*, ¶ 152. The protesters and Mr. Montanio linked arms and sat down. *Id.*, ¶¶ 153-156. After law enforcement surrounded the protesters, Professor Montanio was placed under arrest and charged with trespass and failure to obey a lawful order. *Id.*, ¶ 157. Professor Montanio entered into a deferred prosecution agreement with the City Attorney's Office for the dismissal of his charges. *Id.*, ¶ 158. Defendant ACPD Detective Lance Muniz was the officer who arrested and detained Professor Montanio. *Id.* at 6, ¶ 25.

### C. Harriet Falconetti

Plaintiff Harriet Falconetti is a third-year political science student at UC Denver. *Id.* at 26, ¶ 159. Ms. Falconetti is the news editor for UC Denver's student newspaper, The Sentry. *Id.*, ¶ 160. On the morning of April 26, 2024, Ms. Falconetti arrived on Auraria Campus to cover the protest on Tivoli Quad for The Sentry. *Id.*, ¶ 163. She carried a camera around her neck and took pictures throughout the morning. *Id.*, ¶ 164. Ms. Falconetti saw the protesters sitting on the grass in a line and she moved around them to take photographs. *Id.*, ¶ 165. Several law enforcement officials witnessed Ms. Falconetti taking photos. *Id.*, ¶ 166. At approximately 1:30 p.m., people formed a circle around police. *Id.*, ¶ 167. Ms. Falconetti moved close to the circle so she could have an unobstructed view to take photos. *Id.*, ¶ 168. At one point, she put her camera away

8

in her bag.  *Id.*, ¶ 169.  She joined the people forming a circle around law enforcement.  *Id.*, ¶ 170.  Within minutes of joining the circle, Ms. Falconetti was pushed to the ground by law enforcement.  *Id.*, ¶ 171.  Before she could stand up, law enforcement surrounded Ms. Falconetti.  *Id.* at 27, ¶ 172.  Defendant ACPD Officer Corrie Curry placed her knee or foot on Ms. Falconetti's back, pinned her to the ground, and handcuffed and arrested her.  *Id.* at 5, 27, ¶¶ 23, 173.  Ms. Falconetti was charged with trespass and failure to obey a lawful order.  *Id.* at 27, ¶ 174.  Ms. Falconetti was never issued an order by law enforcement.  *Id.*  The Denver City Attorney's office dismissed the charges against Ms. Falconetti on September 4, 2024.  *Id.*, ¶ 175.

### D.  **Elowyn Fahnestock**

Plaintiff Elowyn Fahnestock arrived to Tivoli Quad on April 26, 2024, around 11:30 a.m., intending to relax on the lawn.  *Id.*, ¶ 177.  Around 12:00 p.m., she noticed a growing police presence on Tivoli Quad and law a line of students, whom she assumed were students, linking arms and facing law enforcement.  *Id.*, ¶ 178.  Ms. Fahnestock joined the line of protesters in solidarity.  *Id.*, ¶ 179.  Not long after the group of protesters sat down, law enforcement surrounded the protesters, prevented their exit, and arrested protesters one by one.  *Id.*, ¶ 180.  By the time officers arrested Ms. Fahnestock, all of the tents behind her had been removed.  *Id.*, ¶ 181.  Ms. Fahnestock was charged with trespassing and failure to obey a lawful order.  *Id.*, ¶ 182.  Ms. Fahnestock entered into a deferred prosecution agreement with the City Attorney's Office for dismissal of her charges.  *Id.* at 28, ¶ 183.  Officer Curry was the officer who arrested and detained Ms. Fahnestock.  *Id.* at 5, ¶ 23.

### E. Alexandra Nickens

Plaintiff Alexandra Nickens is a graduate student at CU Denver pursuing a Master's Degree in Public Administration with a concentration in Social Equity. *Id.* at 28, ¶ 184. Ms. Nickens was working from home when she saw messages on the application Signal regarding a heavy police presence on campus. *Id.*, ¶ 185. Ms. Nickens arrived at Tivoli Quad at approximately 12:40 p.m., where she saw many of her friends sitting on the ground with their arms linked, facing a line of law enforcement in full riot gear. *Id.*, ¶ 187. At approximately 12:40 p.m., Ms. Nickens joined the seated protesters and linked arms with them. *Id.*, ¶¶ 188-89. Ms. Nickens did not hear any dispersal announcements. *Id.*, ¶ 190. Ms. Nickens sat in the line surrounded by police for over two hours and was arrested at approximately 2:30 p.m. *Id.* at 29, ¶ 193. By the time she was arrested, the tents behind her had been completely dismantled. *Id.*, ¶ 194. Ms. Nickens was charged with trespassing and failure to obey a lawful order. *Id.*, ¶ 195. The charges were dismissed by the Denver City Attorney's Office on August 20, 2024. *Id.*, ¶ 196. Detective Muniz was the officer who arrested and detained Ms. Nickens. *Id.* at 6, ¶ 25.

### F. Spencer Pajk

Plaintiff Spencer Pajk biked to Tivoli Quad around 1:00 pm, expecting to participate in the protest with friends who attend school at Auraria Campus. *Id.* at 29, ¶ 197. Upon arrival, Mr. Pajk observed a heavy police presence. *Id.*, ¶ 199. A bystander told Mr. Pajk that police were arresting the seated protesters. *Id.*, ¶ 201. A crowd had gathered to support the individuals sitting on the ground and Mr. Pajk joined the crowd. *Id.*, ¶ 202. Within minutes, law enforcement officers approached Mr. Pajk

and forcefully grabbed him, along with the individual next to him.  *Id.*, ¶ 203.  Mr. Pajk

was arrested, booked, and placed on a jail bus after being on campus for no more than

10 to 20 minutes.  *Id.*, ¶ 204.  Mr. Pajk was not issued an order to leave by law

enforcement.  *Id*.  Mr. Pajk was charged with trespassing and failure to obey a lawful

order.  *Id.* at 30, ¶ 205.  Mr. Pajk entered into a deferred prosecution agreement with the

City Attorney's Office for dismissal of his charges.  *Id.*, ¶ 206.  Defendant ACPD Officer

Joseph Flageolle was the officer who arrested and detained Mr. Pajk.  *Id.* at 6, ¶ 27.

### G.  Joie Ha

Plaintiff Joie Ha is a lecturer in Ethnic Studies at CU Denver.  *Id*. at 30, ¶ 207.

On April 26, 2024, Ms. Ha saw messages on the application Slack, asking for help in

removing the tents from Tivoli Quad.  *Id.*, ¶ 208.  Ms. Ha arrived to Tivoli Quad around

1:15 p.m. and began assisting individuals who were in the process of dismantling the

tents.  *Id.*, ¶ 209.  Once the tents were fully removed, Ms. Ha joined the crowd that had

gathered to support the individuals sitting on the ground.  *Id.*, ¶ 210.  Law enforcement

did not issue a dispersal order while Ms. Ha was at Tivoli Quad.  *Id.*, ¶ 211.  Around

2:00 p.m., without warning, four officers grabbed Ms. Ha and two students standing next

to her, pulling them to the ground.  *Id.*, ¶ 212.  Because their arms were linked, there

was a struggle as law enforcement forcibly separated them.  *Id.*, ¶ 213.  Rather than

instruct Ms. Ha to stand, four officers each grabbed one of her limbs and dragged her

across the ground before taking her into custody.  *Id.*, ¶ 214.  Ms. Ha was charged with

interference and failure to obey a lawful order.  *Id.*, ¶ 215.  Ms. Ha entered into a

deferred prosecution agreement with the City Attorney's Office for dismissal of her

charges.  *Id.,* ¶ 216.  Defendant ACPD Officer John Gaschler was the officer who arrested and detained Ms. Ha.  *Id.* at 6, ¶ 24.

### H.  Sarah Napier

Plaintiff Sarah Napier arrived to Auraria Campus at approximately 10:30 a.m. on April 26, 2024 to participate in the protest.  *Id.* at 31, ¶ 218.  At approximately 12:30 p.m., law enforcement arrived and issued dispersal orders.  *Id.,* ¶ 219.  Ms. Napier joined the protesters and linked arms with them.  *Id.,* ¶ 220.  She was seated on the ground when officers began arresting each of the protesters one by one.   *Id.,* ¶ 221.  By the time Ms. Napier was arrested at approximately 1:45 p.m., all of the tents had been removed.  *Id.,*¶ 222.  Ms. Napier was charged with trespass and failure to obey.  *Id.,* ¶ 223.  Her charges were dismissed by the Denver City Attorney's Office on October 21, 2024 "in the interest of justice."  *Id.,* ¶ 224.  Defendant ACPD Corporal Joshua Bode was the officer who arrested and detained Ms. Napier.  *Id.* at 5, ¶ 22.

### I.  Professor Andrea Maestrejuan

Plaintiff Andrea Maestrejuan is a professor in the Department of History at MSU. *Id.* at 31, ¶ 225.  While leaving a faculty meeting, Professor Maestrejuan noticed an increased police presence on Auraria Campus.  *Id.* at 32, ¶ 231.  Near the center of Tivoli Quad, Professor Maestrejuan saw a student protest, where students were standing in a line with arms linked, facing a line of police officers.  *Id.,* ¶ 232.  Professor Maestrejuan, along with two other faculty members, joined the line of protesters and linked their arms.  *Id.,* ¶ 235.  Shortly after, the group sat down.  *Id.*  Professor Maestrejuan did not hear any dispersal orders.  *Id.,* ¶ 236.  After law enforcement encircled the protesters, individuals began calling out "the tents have been removed"

and "the tents are gone" to dissuade officers from arresting the seated protesters. *Id.* at 33, ¶ 239. Upon hearing these shouts, Professor Maestrejuan observed that the tents had been removed and joined others in calling out that "the tents have all been removed." *Id.*, ¶ 240. Professor Maestrejuan was arrested and charged with trespass and failure to obey a lawful order. *Id.*, ¶¶ 242-43. On September 24, 2024, the Denver City Attorney's Office dismissed both charges against Professor Maestrejuan on the grounds that the City did not believe that it could "prove the case beyond a reasonable doubt." *Id.*, ¶ 244. Defendant ACPD Officer Patrick Flageolle is the officer who arrested and detained Professor Maestrejuan. *Id.* at 6, ¶ 28.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th

13

Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief *Iqbal*, 556 U.S. at 679 (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B. Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court should resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

14

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III. ANALYSIS

Plaintiffs bring claims against all defendants for violation of Article II of the Colorado Constitution pursuant to Colo. Rev. Stat. § 13-21-131, also known as Enhance Law Enforcement Integrity ("ELEIA") claims. *See* Docket No. 20 at 33-40. Specifically, plaintiffs allege that defendants violated Art. II § 10, Freedom of Speech (Claim One); Art. II § 24, Right to Assemble and Petition (Claim Two); Art. II § 7, Unlawful Seizure

15

(Claim Three); and Art. II § 7, Unlawful Arrest (Claim Four).  *Id.*  Plaintiffs also bring

federal claims pursuant to 42 U.S.C. § 1983 against all defendants for violation of the

First Amendment, Freedom of Speech and Assembly (Claim Five); First Amendment

retaliation against all defendants (Claim Six); violation of the Fourth and Fourteenth

Amendment, Unlawful Seizure against all defendants(Claim Seven); violation of the

Fourteenth Amendment, Due Process against all defendants (Claim Eight); and Fourth

Amendment, Malicious Prosecution against all defendants (Claim Nine).  *Id.* at 40-49.

Defendants move to dismiss all of plaintiffs' claims.  *See generally* Docket No.

31.  Defendants contend that plaintiffs' state law ELEIA claims must be dismissed

because defendants are not "peace officers" employed by a "political subdivision" of the

state, as defined by ELEIA.  *Id.* at 3.  Defendants argue that plaintiffs' § 1983 claims

must be dismissed because plaintiffs fail to allege a constitutional violation.  *See id.* at

3-4.  Furthermore, defendants argue that they are entitled to qualified immunity on

plaintiffs' § 1983 claims.  *Id.* at 4.  Defendants contend that the amended complaint

treats "Defendants as an undistinguished monolith" that "cannot survive Rule 12(b)(6)

when a complaint brings claims against officers in their individual capacities."  *Id.* at 4.[3]

---

[3] The Court rejects defendants' argument that the complaint "improperly treats
Defendants as a collective."  *See* Docket No. 31 at 37.  The complaint alleges the officer
who arrested each plaintiff and contains detailed allegations regarding Chief Mollendor
and the orders he issued.  *See, e.g.*, Docket No. 20 at 5-6, 12-14, ¶¶ 20-28, 57-69.
General allegations describe how the officers carried out the order when the protesters
did not disperse.  *See id.* at 22-33.  At this stage in the case, such particularity as to the
individual officers suffices given the allegations of common actions by the officers in
carrying out the orders.

### 1. Claim Five – Section 1983 First Amendment Freedom of Speech Claim

#### a. Constitutional Violation

The Court first considers whether plaintiffs have plausibly alleged a violation of their First Amendment right to freedom of speech.  The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I; *see also Brewer v. City of Albuquerque*, 18 F.4th 1205, 1217 (10th Cir. 2021); *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) ("At its core, 'the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" (quoting *Boos v. Barry*, 485 U.S. 312, 318 (1988))); *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) ("government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972))).  "By incorporation through the Fourteenth Amendment, this prohibition applies to states and their political subdivisions."  *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 979 (10th Cir. 2020).

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Swanson v. Griffin*, 2022 WL 570079, at *3 (10th Cir. Feb. 25, 2022) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).  In traditional public forums, such as sidewalks and streets, a content-based regulation of speech must meet strict scrutiny, while a content-neutral regulation, by contrast, must meet intermediate scrutiny.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  "A designated public forum is property the government has opened for expressive activity, treating the property as if it were a

17

traditional public forum." *Summum v. Callaghan*, 130 F.3d 906, 914 (10th Cir. 1997).

While a government is not required to indefinitely retain the "open character" of a

designated public form, "as long as the property is designated as a public forum, the

government is bound by the same standards as apply in a traditional public forum." *Id.*

(internal quotations and citations omitted).

A content-based regulation is one that is "based upon either the content or

subject matter of speech." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of

N.Y.*, 447 U.S. 530, 536 (1980); *see also Ward*, 491 U.S. at 791 (asking "whether the

government has adopted a regulation of speech because of disagreement with the

message it conveys").  A content-neutral regulation is one that is "justified without

reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (emphasis

omitted) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984));

*see Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 43 n.15 (10th Cir. 2013) ("A policy

is content neutral if its restrictions do not hinge on either the viewpoint or the subject

ma[tter] of the speech.").  In distinguishing between the two, "[t]he government's

purpose is the controlling consideration." *Id*.

"Viewpoint discrimination is a subset – and a particularly 'egregious form' – of

content discrimination." *Pahls*, 718 F.3d at 1229 (quoting *Rosenberger*, 515 U.S. at

829); *see also Taylor*, 713 F.3d at 43 n.15 ("Subject matter regulation is 'not as

obnoxious as viewpoint-based regulation,' but either form of content regulation raises

constitutional concerns." (quoting *Hill v. Colorado*, 530 U.S. 703, 723 (2000))); *see also

Ognibene v. Parkes*, 671 F.3d 174, 192 (2d Cir. 2012) ("Viewpoint discrimination is a

subset of content discrimination.").  Viewpoint discrimination occurs "[w]hen the

18

government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* "Both content- and viewpoint-based speech restrictions are presumptively invalid." *Pahls*, 718 F.3d at 1229 (citing *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009)); *Rosenberger*, 515 U.S. at 830–31; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

The complaint alleges that, after Chief Mollendor's first dispersal order, Z Williams asked whether legal observers standing on the sidewalk, away from the encampment, were subject to the dispersal order. Docket No. 20 at 13, ¶ 65. Chief Mollendor replied, "[e]veryone needs to clear the campus." *Id.*, ¶ 66. When individuals arrived for the Friday Muslim Prayer, who were not part of the protest, a law enforcement officer told Chief Mollendor that they would have to issue dispersal orders to those individuals as well. *Id.* at 18-19, ¶¶ 95-96.

The first step in "analyzing restrictions on private speech on government property" is to determine whether the speech at issue is protected by the First Amendment. *See Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1138 (10th Cir. 2001). Second, the court must identify the forum at issue. *Id.* at 1338-39. Defendants do not contest that plaintiffs engaged in First Amendment-protected speech on April 26, 2024 and that Tivoli Quad is a public, designated forum. *See* Docket No. 31 at 11-20 & n.7; Docket No. 20 at 41, ¶¶ 304-05. Here, the speech at issue is the expressive activity that occurred during the protest, which includes assembling on Tivoli Quad,

19

linking arms, and refusing to leave after the dispersal orders were issued.  *See* Docket No. 20 at 22-33.

Thus, the Court turns to whether the dispersal orders were content-based or content-neutral and, in turn, "whether the justifications for exclusion from the relevant forum satisfy the requisite standard."  *See Wells*, 257 F.3d at 1139 (citation omitted). Defendants contend that the dispersal orders were content-neutral, making "no distinction based on the content of anyone's speech."  *See* Docket No. 31 at 16-17. Defendants also argue that the Encampment Policy cannot be considered a content-based restriction on the basis that it was used as a pretext or selectively enforced against the protesters.  *See id.* at 12-14.

Both sides assume that the dispersal orders were predicated on violations of the Encampment Policy.  However, the complaint does not allege that General Counsel Speer told Chief Mollendor to remove all individuals at Tivoli Quad due to violations of the Encampment Policy.  Rather, the complaint alleges that General Counsel Speer told Chief Mollendor "to remove the individuals present at Tivoli Quad, without distinction between those responsible for the tents and those engaging in constitutionally protected speech."  Docket No. 20 at 10, ¶ 47.  Furthermore, Chief Mollendor's dispersal orders indicated that people had to leave the area because the assembly was "in violation of DRMC 38-115 Trespass," with no mention of the Encampment Policy.  *Id.* at 12, ¶ 62. The reasonable inference from the complaint is that General Counsel Speer told a select number of individuals that they were violating the Encampment Policy, those individuals refused to leave, and thus AHEC decided to revoke its consent for everyone

20

to be on Tivoli Quad.  *See id.* at 8, 10, ¶¶ 39, 43-49.  The Court next addresses whether the dispersal orders constitute a violation of plaintiffs' First Amendment rights.

The Court finds that the complaint does not plausibly allege that the dispersal orders were content-based on their face.  As plaintiffs note, the "allegations in this case are that ACPD suppressed a peaceful protest in a public forum through unlawful dispersal orders that required *everyone* to leave the campus regardless of their role, location, or conduct."  *See* Docket No. 45 at 12 (emphasis added).  In the dispersal orders, Chief Mollendor stated that "[t]his assembly is in violation of DRMC 38-115 Trespass" and that "[y]ou must disperse."  Docket No. 20 at 12, ¶ 62.  Chief Mollendor did not indicate that only the protesters had to disperse, but rather ordered everyone in the Tivoli Quad to disperse.  *See Fuller v. Salt Lake City*, 775 F. Supp. 3d 1212, 1222 ("On their faces, the curfew orders directly regulated conduct, not speech.  And the regulated conduct was far from necessarily expressive: the orders generally barred people from being outside in public areas at certain hours, whether or not they were engaged in speech protected by the First Amendment.").  The dispersal orders were content-neutral because they ordered everyone to leave the area, regardless of whether such person was engaged in speech and regardless of any speech's content.  *See id.* In fact, the complaint alleges that a Denver police officer told Chief Mollendor that they would need to issue dispersal orders to a Muslim Friday Prayer group that arrived at 1:30 p.m.  Docket No. 20 at 18-19, ¶¶ 95-96.

Nevertheless, plaintiffs argue that the dispersal orders were content-based because they were selectively enforced and pretextual.  Docket No. 45 at 12-15, 19-21. "Courts have recognized that selective enforcement of a neutral and facially

constitutional law may run afoul of the First Amendment if the government's

enforcement choices turn on the content or viewpoint of speech*." Fuller*, 775 F. Supp.

3d at 1224 (internal quotation, alteration, and citation omitted).  Even if the complaint did

plausibly allege that the dispersal orders were issued on the basis of the Encampment

Policy, plaintiffs' contention that the Encampment Policy was not enforced at other

events that made use of "tents and structures" does not show that the Encampment

Policy was enforced based on the content of plaintiffs' protest.  *See* Docket No. 45 at

15.  Plaintiffs make no argument that the "other events" were forms of speech or

expressive conduct that were treated more favorably than plaintiffs' protest.  At most,

the complaint's allegations suggest that the dispersal orders were directed against

expressive activity, regardless of content.  *See Fuller,* 775 F. Supp. 3d at 1224

(rejecting plaintiff's selective enforcement argument that was based on defendant's

failure to enforce a curfew order against non-expressive conduct, like dog-walking,

because "this evidence does not support the proposition that any selective enforcement

was based on the content of anyone's speech.  Dog-walking is not expressive conduct,

after all.").  By extension, there are no allegations that defendants' arrests of plaintiffs –

based on violation of the dispersal orders – were based on the content or viewpoint of

plaintiffs' expressive activity.

Similarly, plaintiffs fail to plausibly allege that the purpose of the dispersal orders

was based on disagreement with the protest's content.  "[L]aws that cannot be justified

without reference to the content of the regulated speech, or that were adopted by the

government because of disagreement with the message the speech conveys," though

facially content-neutral, will nevertheless be considered content-based.  *Reed v. Town*

*of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (internal quotations, alterations, and citation omitted). Plaintiffs contend that issuing dispersal orders to people participating in a peaceful protest demonstrates that enforcement was justified by the content of plaintiffs' speech. *See* Docket No. 45 at 20. Plaintiffs point to the complaint's allegation that "[l]aw enforcement rejected obvious alternatives" to completely clearing Tivoli Quad, which "would have addressed any tent-related concerns without suppressing speech" and that enforcement continued after the tents were removed. *See id.* Again, plaintiffs' argument is focused on defendants' alleged desire to suppress speech or expressive content in general, without allegations suggesting that enforcement was predicated on the fact that plaintiffs were protesting in support of a particular viewpoint.[4]

In sum, the Court finds that the dispersal orders were facially content-neutral, and plaintiffs do not plausibly allege facts that would otherwise render the dispersal orders content-based regulations.

Content-neutral regulations "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (citation omitted). Under intermediate scrutiny, a content-neutral regulation is not unconstitutional if is narrowly tailored, such that "it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially

---

[4] The complaint alleges that Chief Mollendor told Z Williams that everyone had to "clear the campus," thus allegedly confirming that "the area was closed to all, including students, journalists, faculty, and legal observers." *See* Docket No. 20 at 13, ¶ 66. However, there are no allegations that bystanders outside Tivoli Quad were arrested for violating the dispersal orders, and the complaint incorporates a photograph that shows bystanders standing on the sidewalk outside Tivoli Quad after the final dispersal order had been given. *See id.* at 17, ¶ 90.

23

more speech than necessary to further those interests." *Id.* (citation omitted).  The
regulation must "leave[ ] open ample alternative channels of communication." *Brewer*,
18 F.4th at 1220.

Defendants contend that "AHEC has significant interests in clearing the Quad of
an overnight encampment that violates campus policy, in ensuring public and campus
safety, and in protecting against hygiene concerns that are associated with such
encampments." Docket No. 31 at 17.   Defendants maintain that the "dispersal order
was 'narrowly tailored' to serve these interests because a temporary dispersal of the
Quad was necessary to remove the encampment, especially when considering it was
unclear who erected the tents, who they belonged to, or what contents were contained
inside them." *Id.* at 18.

While defendants argue that the purpose of enforcement was to ensure public
and campus safety and to address hygiene concerns, they do not support this argument
by citing any allegations in the complaint.  It may be logical that, even though the tents
had only been in Tivoli Quad a short time, AHEC had concerns about hygiene and
wanted to clear the Quad, not to disrupt a protest, but rather to inspect and clean the
area.  But, not only is the complaint devoid of such allegations, but defendants cite no
evidentiary support for this theory, whether or not the Court could properly take such
evidence into account.  Moreover, plaintiffs object to the Court crediting any such
inferences.  *See* Docket No. 45 at 18 n.11.  Plaintiffs point to allegations that are
inconsistent with defendants' theory, namely, that Z Williams asked Chief Mollendor
whether the protesters could move to the sidewalks and away from the tents, thus
permitting "law enforcement access to remove the tents without shutting down the

24

protest."  Docket No. 20 at 11, ¶¶ 55-56.  Chief Mollendor rejected this suggestion,

stating that "[t]hey need to leave the campus."  *Id.* at 12, ¶ 57.  Such allegations are

inconsistent with the supported governmental interest that defendants ask the Court to

assume.

Accordingly, the Court finds that plaintiffs have plausibly alleged a violation of

their First Amendment right to freedom of speech and assembly.

### b.  Clearly Established Law

The Court finds that it was clearly established that plaintiffs had a right to engage

in First Amendment expressive activity at Tivoli Quad that could not be infringed upon

absent an important or substantial governmental interest.  *See Heideman v. S. Salt*

*Lake City*, 348 F.3d 1182, 1197 (10th Cir. 2003) ("To survive intermediate scrutiny, the

government must be able to demonstrate that the challenged speech restriction serves

a 'substantial governmental interest.'").  The Court finds that, at this early stage of the

proceedings, Chief Mollendor is not entitled to qualified immunity.  There are no

allegations in the complaint that General Counsel Speer communicated an important

governmental interest to Chief Mollendor or that Chief Mollendor learned of an important

governmental interest afterwards.  Accordingly, the Court finds that Chief Mollendor is

not entitled to qualified immunity on Claim Five.

The Court will next consider whether the other defendants – who were the

arresting officers[5] but did not issue the unlawful dispersal orders – are entitled to

qualified immunity.  The complaint alleges that Chief Mollendor issued a radio

---

[5] The "arresting officers" are those defendants other than Chief Mollendor:
defendants Bode, Curry, Gaschler, Muniz, Joseph Flageolle, Martinez, and Patrick
Flageolle.  *See* Docket No. 1 at 5-6, ¶¶ 22-28.

transmission stating, "[c]hief to all units, this group has refused to acknowledge our legal counsel's request to leave.  This is now an unlawful protest."  Docket No. 20 at 10, ¶ 48. Chief Mollendor's dispersal orders informed the arresting officers that "[t]his assembly is in violation of DRMC 38-115 Trespass" and that people had fifteen minutes to leave the area.  *Id.* at 12, ¶ 62.

The Court finds that that the arresting officers did not violate clearly established constitutional rights of which a "reasonable person would have known."  *See Harlow*, 457 U.S. at 818.  Based on the information from Chief Mollendor, the arresting officers had reason to believe that General Counsel Speer told the group at Tivoli Quad to leave, they refused to do so, and as such the group was in violation of Den. Rev. Mun. Code § 38-115 unless they left the area.  Plaintiffs cite a line of cases that purportedly accord with the Supreme Court's holding "that law enforcement cannot interfere with peaceful demonstration unless there exists a 'clear and present danger' of riot, imminent violence, obstruction of traffic, or other immediate threat to public safety."  *See* Docket No. 45 at 15-16.  Setting aside that a restriction subject to intermediate scrutiny need only demonstrate an important governmental interest, *see Heideman*, 348 F.3d at 1197, the existence of a clear and present danger is not the only circumstance under which a peaceful demonstration can be restricted.  *See Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("enjoining or preventing First Amendment activities before demonstrators have *acted illegally or* before the demonstration poses a clear and present danger is presumptively a First Amendment violation") (emphasis added). Moreover, public universities are permitted to revoke consent and issue citations for trespassing.  *See, e.g., Wilson v. Wichita State Univ.*, 662 F. App'x 626, 629 (10th Cir.

26

2016) (unpublished) ("Generally, universities have discretion to exclude otherwise constitutionally protected activities from their campuses, provided that the activities violate reasonable rules or substantially interfere with educating students."); *see also Dames v. Roberts*, 2026 WL 332314, at *14 (M.D.N.C. Feb. 4, 2026) (finding that a university has "authority to remove individuals from its campus who violate either the law or its policies"). The cases cited by plaintiffs do not show that it was clearly established law that an arresting officer had to question the underlying validity of the dispersal orders to determine whether Chief Mollendor violated the First Amendment. *See Bidwell v. Cnty. of San Diego*, 607 F. Supp. 3d 1084, 1099 (S.D. Cal. 2022), *aff'd,* 2023 WL 7381462 (9th Cir. Nov. 8, 2023) ("Plaintiffs cite no case showing that it is clearly established law the individual arresting officers were required to make an 'individualized inquiry' as to whether the underlying dispersal order was lawful before arresting persons for refusing that order."). Accordingly, the Court will grant qualified immunity to the arresting officers as to Claim One.

### 2. Claims Six and Seven – Section 1983 First Amendment Retaliation and Unlawful Seizure Claims

#### a. Constitutional Violation

Because a lack of probable cause is an element of plaintiffs' First Amendment retaliation and unlawful seizure claims, and defendants contend that there was probable cause for plaintiffs' arrest, *see* Docket No. 31 at 20, the Court considers Claims Six and Seven together. Generally, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks and citation omitted). To establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) he

27

was engaged in a constitutionally protected activity; (2) the defendant's action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's actions were substantially motivated as a response to plaintiff's exercise of his First Amendment speech rights. *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007). Ordinarily, a plaintiff must plead and prove the absence of probable cause for the arrest. *Id*.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. A "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007). An arrest requires probable cause to believe that the arrestee committed a crime. *Cortez v. McCauley*, 478 F.3d 1108, 115-16 (10th Cir. 2007) (en banc).

"In a qualified immunity context, the probable cause evaluation is a question of law appropriate for resolution by the Court." *Shimomura v. Carlson*, 17 F. Supp. 3d 1120, 1132 (D. Colo. 2014) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). When determining whether an officer has probable cause for an arrest, the court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (internal quotation marks and citation omitted). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that

28

the arrestee has committed or is committing an offense."  *York v. City of Las Cruces*,

523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th

Cir. 1995)).  It is not a "high bar" for a court to find that an officer had probable cause.

*Wesby*, 583 U.S. at 57 (citation omitted).  Rather, the existence of probable cause

"requires only a probability or substantial chance of criminal activity, not an actual

showing of such activity."  *Id*. (citation omitted).

All plaintiffs, except for Ms. Ha, were arrested for trespassing and failure to obey

a lawful order.  *See* Docket No. 20 at 24, 25, 27, 29, 30, 31, 33, ¶¶ 141, 157, 174, 182,

195, 205, 223, 243.  Ms. Ha was arrested for interference with police authority and

failure to obey a lawful order.  *Id.* at 30, ¶ 215.  The charge of failure to obey is codified

at Denver Municipal Code § 38-31(c), which states that it is

> unlawful for any person to fail to obey a lawful order of a police officer if such
> failure interferes with or hinders such police officer in the discharge of his official
> duties.  It is an affirmative defense to this subsection that the failure to obey did
> not interfere with or hinder the police officers.

Den. Rev. Mun. Code § 38-31(c).  The order at issue is Chief Mollendor's dispersal

order:

> I am Chief Mollendor of the Auraria Campus Police Department.  This assembly
> is in violation of DRMC 38-115 Trespass.  You must disperse.  Failure to
> disperse will subject each of you to arrest and prosecution.  If you remain,
> reasonable and necessary force may be used to remove you.  The following are
> routes of dispersal for you to peacefully leave the area: East on Larimer St, North
> on 11th Street or West on Walnut Street.  You have 15 minutes to leave the area.
> The time is 12:30.

*See* Docket No. 20 at 12, ¶ 62.  Plaintiffs contend that the dispersal orders were

unlawful and cannot be the basis for plaintiffs' § 38-31(c) charges because they

constituted an "unlawful suppression of speech."  *See* Docket No. 45 at 32.  At this

stage, plaintiffs have plausibly alleged that the dispersal orders were unlawful because

29

they violated their First Amendment rights.  Therefore, plaintiff have sufficiently alleged that there was no probable cause to arrest plaintiffs for failure to obey a lawful order in violation of § 38-31(c) given that there was no lawful order.

Turning to the trespassing charge, § 38-115(a) of the Denver Municipal Code states that it is:

> unlawful for any person knowingly to enter or remain upon the premises of another when consent to enter or remain is absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof.

Den. Rev. Mun. Code § 38-115(a).  The complaint alleges that General Counsel Speer told Chief Mollendor to remove the individuals at Tivoli Quad.  Docket No. 20 at 10, ¶ 47.  Chief Mollendor acted on this request, issuing a radio transmission that the group on Tivoli Quad had "refused to acknowledge our legal counsel's request to leave" and, as a result, the protest was now "unlawful."  *Id.*, ¶ 48.

A "government official may not base her probable cause determination on an unjustifiable standard, such as speech protected by the First Amendment."  *Mink v. Knox*, 613 F.3d 995, 1003-04 (10th Cir. 2010) (internal quotation and citation omitted). Consistent with the Court's finding that plaintiffs have sufficiently alleged a violation of their First Amendment right in Claim Five because there is no alleged basis for an important governmental interest, the Court finds that plaintiffs have sufficiently alleged that the dispersal orders were unlawful restrictions of speech.  Thus, plaintiffs' refusal to obey the unlawful dispersal orders and plaintiffs continuing to exercise their First Amendment rights cannot be the basis for defendants' probable cause finding that plaintiffs were trespassing.

30

As noted above, Ms. Ha was also charged with interference with police
authority, pursuant to Den. Rev. Mun. Code § 38-31(a), which provides:

> It shall be unlawful for any person, in any way, to interfere with or hinder
> any police officer, any member of the police department, or any person
> duly empowered with police authority, while such officer, member, or
> person duly empowered with police authority is discharging or apparently
> discharging their duties.

Den. Rev. Mun. Code § 38-31(a).  The complaint alleges that Ms. Ha assisted
individuals who were in the process of removing tents.  Docket No. 20 at 30, ¶ 209.  Ms.
Ha then joined the crowd that had formed to support the protesters sitting on the
ground.  *Id.*, ¶ 210.  Defendants, without warning, grabbed Ms. Ha and two other people
while her arms were linked with other protesters and pulled them to the ground.  *Id.*,
¶ 212.  Because Ms. Ha's arms were linked with other protesters, there was a struggle
as law enforcement separated her from the others.  *Id.*, ¶ 215.  These allegations
support a finding of probable cause for violation of § 38-31(a).  Ms. Ha linked her arms
with other protesters, which hindered law enforcement's efforts to arrest her and
resulted in a "struggle."  *See id.*, ¶ 213.  The Court finds that Ms. Ha fails to state a
constitutional violation under Claims Six and Seven because there was probable cause
for her arrest.

Except as it relates to Ms. Ha, the complaint plausibly alleges that defendants
lacked probable cause to arrest plaintiffs and states a Fourth Amendment unreasonable
seizure and First Amendment retaliation claim.  Regarding the First Amendment
retaliation claim, defendants do not contest that plaintiffs were engaged in
constitutionally protected activity, that the arrests would chill a person of ordinary
firmness from continuing to engage in the protected activity, and that it is plausible

defendants' actions were substantially motivated by plaintiffs' exercise of their First

Amendment rights.  *See* Docket No. 31 at 21-32.  The Court finds that the complaint

plausibly alleges these remaining elements.

### b.  Clearly Established Law

To determine whether the law was clearly established in the context of plaintiffs'

First Amendment retaliation and Fourth Amendment claims, a court considers whether

there was arguable probable cause for plaintiffs' arrest.  *See Detreville v. Gurevich,*

2025 WL 1874587, at *6 (10th Cir. July 8, 2025); *Mglej v. Gardner*, 974 F.3d 1151, 1164

(10th Cir. 2020).  "Arguable probable cause" is another way of saying that the officers'

conclusions about whether probable cause existed rested on a reasonable but mistaken

belief.  *Cortez v. McCauley*, 478 F.3d 1108, 1120-21(10th Cir. 2007); *see also Jordan v.*

*Jenkins*, 73 F.4th 1162, 1170 (10th Cir. 2023).  The "protection of qualified immunity

applies regardless of whether the government official's error is a mistake of law, a

mistake of fact, or a mistake based on mixed questions of law and fact."  *Deutsch v.*

*Jordan*, 618 F.3d 1093, 1098 (10th Cir. 2010) (quoting *Pearson*, 555 U.S. at 231); *see*

*also Mocek v. City of Albuquerque,* 813 F.3d 912, 922 (10th Cir. 2015); *Felders ex rel.*

*Smedley v. Malcom*, 755 F.3d 870, 879 n.3 (10th Cir. 2014) (although "an officer's

mistake of law cannot serve as a basis for probable cause," the second prong of the

qualified immunity analysis "protects officials from civil liability for mistakes of law if

reasonably made").

It is clearly established that a "government official may not base [his] probable

cause determination on an unjustifiable standard, such as speech protected by the First

Amendment."  *See Mink*, 613 F.3d at 1003-04 (internal quotations and citation omitted).

Because a "reasonable person would have known" that the dispersal orders were unlawful restrictions of speech, Chief Mollendor could not base his probable cause determination on plaintiffs' failure to obey the dispersal orders. *See Harlow*, 457 U.S. at 818. Accordingly, the Court will deny qualified immunity for Chief Mollendor on Claims Six and Seven.

Turning to the arresting officers, "a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998) (internal quotations and citation omitted). Similarly, "under the 'fellow officer' rule, probable cause is to be determined by the courts on the basis of the collective information of the police involved in the arrest, rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest." *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985) (internal quotation and citation omitted). Here, Chief Mollendor told the arresting officers that the group at Tivoli Quad "refused to acknowledge . . . legal counsel's request to leave" such that the protest is "unlawful." Docket No. 20 at 10, ¶ 48. Furthermore, Chief Mollendor's dispersal orders told the arresting officers that the group at Tivoli Quad were violating Den. Rev. Mun. Code § 38-115 and had fifteen minutes to leave the area. *See id.* at 12, ¶ 62. Thus, the arresting officers had arguable probable cause to believe that the individuals on Tivoli Quad remained on the premises despite "consent to enter or remain" being "absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof."

33

*See* Den. Rev. Mun. Code § 38-115(a).  As a result, the arresting officers also had

arguable probable cause to believe that the dispersal orders were lawful.

The next question is whether the arresting officers had arguable probable

cause to believe that plaintiffs were part of the group that had refused to obey the

dispersal orders.  The Court finds that the arresting officers had arguable probable

cause to believe that plaintiffs Boodrookas, Montanio, Falconetti, Fahnestock, Nickens,

Napier, and Maestrejuan failed to obey the dispersal orders based on their conduct

following the dispersal orders.  Chief Mollendor issued several dispersal orders, which

occurred at 12:30 p.m., 12:36 p.m., 12:41 p.m., and 12:46 p.m.  *Id.* at 12, 14, ¶¶ 62, 69,

74.  The dispersal order issued at 12:30 p.m. indicated that individuals had fifteen

minutes to comply.  *Id.* at 12, ¶ 62.  At 12:38 p.m., the protesters linked arms and sat

down.  *Id.* at 14, ¶ 70.  Professor Boodrookas joined the protesters at 12:38 p.m. and

was the person who "encouraged everyone to sit down."  *Id.* at 23, ¶ 136.  Professor

Montanio also joined and sat down with the protesters.  *Id.* at 25, ¶¶ 154, 156.  Ms.

Falconetti arrived at Tivoli Quad in the morning and was therefore there when all of the

dispersal orders were issued.  *Id.* at 26, ¶¶ 163-170.  Ms. Fahnestock was also at Tivoli

Quad for all the dispersal orders, arriving around 11:30 a.m.  *Id.* at 27, ¶ 177.  Ms.

Nickens arrived at approximately 12:40 p.m. and would have been at Tivoli Quad to

hear, at the very least, the 12:46 p.m. dispersal order.  *Id.* at 28, ¶ 187.  Ms. Napier

arrived at the campus at 10:30 a.m.  *Id.* at 31, ¶ 218.  Professor Maestrejuan joined the

protesters, linked arms, and sat down after leaving a faculty meeting at approximately

12:30 p.m.  *Id.* at 32, ¶ 230.[6]  Thus, the arresting officers had arguable probable cause to believe that these plaintiffs failed to obey a lawful order and were trespassing.

In sum, these plaintiffs were present for at least one of the dispersal orders and took actions contrary to the order by sitting down or refusing to leave.  There are no factual allegations showing that defendants should have understood that certain plaintiffs did not hear the dispersal orders.  After issuance of the dispersal orders, plaintiffs failed to leave the area.  Perceiving these facts would "lead a prudent person to believe" that plaintiffs had failed to obey the lawful dispersal orders.  *See York*, 523 F.3d at 1210.   Thus, these plaintiffs fail to plausibly allege that defendants lacked arguable probable cause for their arrests for failure to obey a lawful order in violation of § 38-31(c) and for trespassing in violation of § 38-115.

---

[6] Although alleged to have arrived at Tivoli Quad in time to at least hear some of the dispersal orders, the complaint alleges that Mr. Boodrookas, Ms. Falconetti, Ms. Nickens, and Ms. Maestrejuan did not hear the dispersal orders or were not issued dispersal orders.  *See* Docket No. 20 at 20, 23, 28, 32, ¶¶ 137, 174, 190, 236.  However, the Court finds that the complaint alleges facts that show an objectively reasonable officer would have reason to believe that Ms. Boodrookas, Ms. Falconetti, Ms. Nickens, and Ms. Maestrejuan failed to obey the dispersal order.  *See York*, 523 F.3d at 1210.  These plaintiffs were all at Tivoli Quad when the dispersal orders were issued, such that an objectively reasonable officer would believe that they heard the dispersal orders and refused to leave Tivoli Quad.  Not only were plaintiffs present at Tivoli Quad for at least one of the dispersal orders, but plaintiffs took actions that would indicate to a reasonable officer that they were refusing to disperse.  Mr. Boodrookas linked arms with the protesters and encouraged them to sit down, Ms. Falconetti joined a circle that was enclosing law enforcement, and Professor Maestrejuan and Ms. Nickens joined the seated protesters and linked arms with them.  Docket No. 20 at 23, 26, 28, 32, ¶¶ 136, 167, 190, 335.  *See Rodriguez v. Chavez*, No. 12-cv-01071-PAB-MJW, 2015 WL 5174226, at *8 (D. Colo. Sept. 3, 2015) (rejecting plaintiff's argument that she did not refuse to obey a lawful order because she did not understand the order and finding that defendant had probable cause to arrest plaintiff for violation of D.R.M.C. § 38-31(c) because "plaintiff does not establish when plaintiff's inability to understand English became a fact known" to defendant and "plaintiff's subjective justifications for failing to follow [defendant's] commands are insufficient to defeat probable cause").

Unlike the other plaintiffs, however, Mr. Pajk did not arrive at Tivoli Quad until after Chief Mollendor concluded giving dispersal orders. Mr. Pajk arrived at Tivoli Quad around 1:00 p.m. Docket No. 20 at 29, ¶ 198. Upon arrival, Mr. Pajk joined a crowd of people that had gathered around the group of protesters who sat down following issuance of the second dispersal order. *See id.*, ¶ 202. On these facts, an officer could be under a reasonable but mistaken belief that Mr. Pajk was part of the group that had received and refused to obey the dispersal orders.

In *Kampas v. City of St. Louis, Missouri*, 157 F.4th 937, 940 (8th Cir. 2025), the plaintiffs attended a protest as legal observers. The protesters were blocking traffic. *Id.* Plaintiffs did "not step foot onto Interstate 64, and no officer saw them on the interstate highway." *Id.* Before exiting the interstate highway, the protesters surrounded plaintiffs and "walked around the grassy area where the Plaintiffs stood." *Id.* Law enforcement surrounded the group of protesters, prevented them from physically leaving, and arrested the protesters and plaintiffs for trespassing, despite plaintiffs informing law enforcement that they had not entered the highway. *Id. Kampas* held that the defendant officers had arguable probable cause to arrest plaintiffs because "it was objectively reasonable for the officers to believe that the Plaintiffs were part of the group of trespassing protesters." *Id.* at 943. The court noted that "Plaintiffs made no attempt to distance themselves from the group" and "it was objectively reasonable for the officers to believe that the Plaintiffs were part of the unit that had engaged in unlawful activity." *Id.* Similarly, here, Mr. Pajk integrated himself with a group of individuals that officers had reason to believe had violated the dispersal orders. *See also Lyons v. City of Seattle,* 214 F. App'x 655, 657 (9th Cir. 2006) (unpublished) (holding that officers had

probable cause to arrest plaintiffs for failure to obey a dispersal order where "the plaintiffs stood with the group and took part in its collective conduct" and "the police had no reason to believe that the plaintiffs were strangers (or even latecomers) to the protest"). It was reasonable for defendants to "believe there was a 'fair probability' that the plaintiffs, like others in the protest, had heard dispersal orders with which they could have complied." *See id.* at 658.

Accordingly, the Court finds that the arresting officers are entitled to qualified immunity on Claims Six and Seven.

### 3. Claim Nine – Section 1983 Fourth Amendment Malicious Prosecution Claim

"A malicious prosecution claim brought under the Fourth Amendment requires a showing that (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014) (internal quotation and citation omitted).

While defendants are correct that probable cause is an element of a malicious prosecution claim, as is the case for plaintiffs' First Amendment retaliation and unlawful seizure claims, *see* Docket No. 31 at 20, the probable cause analysis differs on a malicious prosecution claim. For a malicious prosecution claim, "the precise question is not whether probable cause supported [plainitff's] original arrest but whether probable cause supported her subsequent continued confinement and prosecution." *Sodaro v. City & Cnty. of Denver*, 753 F. Supp. 3d 1224, 1236 (D. Colo. 2024). Thus, the Court must consider the probable cause analysis in the context of plaintiffs' allegation that

37

defendants "acted with malice in initiating the charges against Plaintiffs and causing their continued prosecution."  *See* Docket No. 20 at 48, ¶ 365.

While the Court finds that there was no probable cause for plaintiffs' arrest, except for Ms. Ha, "something more than an illegal arrest is required to support a Section 1983 claim for malicious prosecution against a police officer."  *See Seabolt v. City of Muskogee*, 2008 WL 4693131, at *5 (E.D. Okla. Sept. 24, 2008), *report and recommendation adopted as modified*, 2008 WL 4693127 (E.D. Okla. Oct. 22, 2008). "The Fourth Amendment in the context of a malicious prosecution claim deals with *judicial determinations* of probable cause, either at the warrant application stage or during a *Gerstein* hearing following a warrantless arrest."  *Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008).

The complaint is devoid of allegations that address the probable cause supporting plaintiffs' continued confinement and prosecution.  The complaint merely alleges that "ACPD officers assisted in processing arrestees and handling paperwork and facilitating their transfer to the detention center."  *See* Docket No. 20 at 5, ¶ 21.  For purposes of a malicious prosecution claim, "[p]robable cause is measured by considering whether, without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [plaintiff's] continued confinement or prosecution."  *See Bledsoe v. Carreno*, 53 F.4th 589, 614-15 (10th Cir. 2022) (internal quotation and citation omitted).  For instance, "a plaintiff can challenge the institution of legal process as wrongful when arrested without a warrant by challenging the probable cause determination made during the constitutionally-required probable cause hearing."  *See Detreville*, 2025 WL 1874587, at *7 (internal quotations

38

and citation omitted).  Without any allegations addressing the probable cause, or lack thereof, supporting plaintiffs' charges post-arrest, plaintiffs cannot carry their burden to show that no probable cause supported defendants' continued confinement and prosecution of plaintiffs.  Because plaintiffs have not plausibly alleged a violation of their Fourth Amendment rights to be free from malicious prosecution, defendants are entitled to qualified immunity on Claim Nine.

### 4.  Claim Eight – Section 1983 Fourteenth Amendment Due Process Claim

The complaint alleges that the "dispersal order issued by Defendant Mollendor failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct was prohibited and encouraged arbitration and discriminatory enforcement."  Docket No. 20 at 46, ¶ 347.  Defendants contend that they are entitled to qualified immunity on Claim Eight because the dispersal orders gave plaintiffs fair notice that they needed to leave the area.  Docket No. 31 at 32-34.  Furthermore, defendants argue that the complaints' allegations that some plaintiffs did not hear the dispersal orders does not affect the qualified immunity analysis because "the inquiry does not turn on the subjective perspective of a plaintiff," but whether "from an objective officer's reasonable perspective, whether an officer could have reasonably believed the dispersal order was heard."  *Id.* at 34-35.

Plaintiffs respond that the dispersal orders "failed the basic requirements of notice and a meaningful chance to comply" because it "did not identify the specific violation (tents) nor explain how to cure it (*e.g.* remove tents, move to another area, allow law enforcement access to the tents)."  Docket No. 45 at 40.  Plaintiffs contend that the orders failed to provide sufficient due process because they provided "no

explanation of why the Plaintiffs were being asked to disperse nor explain what specific conduct made their protest unlawful." *Id.* at 41.  Furthermore, plaintiffs contend that their due process claim "does not rise or fall on whether each individual Plaintiff heard the dispersal order, but on whether the order itself was constitutionally valid, provided fair notice, and was adequately applied." *Id.* at 42.

In analyzing a procedural due process claim,[7] "courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citation omitted).  "The essence of procedural due process is the provision to the affected party of some kind of notice and some kind of hearing." *Moore v. Bd. of Cnty. Comm'rs of Cnty. of Leavenworth*, 507 F.3d 1257, 1259 (10th Cir. 2007) (internal alterations, quotations, and citation omitted).

The Court finds that defendants are entitled to qualified immunity on this claim because there is no clearly established law that a dispersal order must provide the level of specificity advocated by plaintiffs in order to comply with the Fourteenth Amendment. In plaintiffs' view, it was not enough for the dispersal orders to indicate that dispersal was being ordered due to violation of Den. Rev. Mun. Code § 38-115(a) and that plaintiffs had fifteen minutes to leave the area via the routes designated by law enforcement.  Rather, plaintiffs claim that the dispersal orders should have indicated that the underlying reason for the § 38-115(a) violation was due to failure to abide by

---

[7] In their response, plaintiffs confirm that Claim Eight is a procedural due process claim.  Docket No. 45 at 40.

the Encampment Policy.  Furthermore, plaintiffs argue that the dispersal orders should have informed protesters that they would not have to disperse so long as they came into compliance with the Encampment Policy by removing the tents or shifting the protest to a different area of campus.

The cases cited by plaintiffs, *Gregory v. City of Chicago*, 394 U.S. 111, 89 (1969), and *City of Chicago v. Morales*, 527 U.S. 41, 67 (1999), do not establish a constitutional requirement for notice with this level of specificity.  *See* Docket No. 45 at 41-42.  In *Gregory*, plaintiffs' claims arose out of a demonstration in which plaintiffs marched in a lawful fashion, but where onlookers became "unruly."  *Gregory*, 394 U.S. at 111.  In response to the unrest, Chicago police demanded that plaintiffs disperse.  *Id.* at 112.  When plaintiffs did not obey, they were arrested for disorderly conduct.  *Id.* *Gregory* held that, because there was no evidence that plaintiffs' conduct was disorderly, their convictions for disorderly conduct were "so totally devoid of evidentiary support" that they violated due process.  *Id.*  *Gregory* rejected the lower court's reasoning that plaintiffs' convictions could stand because they were "convicted not for the manner in which they conducted their march but rather for their refusal to dispense when requested to do so by Chicago police," holding that "petitioners were charged and convicted for holding a demonstration, not for a refusal to obey a police officer."  *Id.* *Gregory* does not hold that law enforcement officers' dispersal order had to provide certain information to constitute notice under the Fourteenth Amendment.  Rather, *Gregory* held that, where plaintiffs were not charged for refusal to obey, plaintiffs' conviction could not be sustained based on plaintiffs' failure to comply with the dispersal order.  *Id.*  Plaintiffs rely on Justice Black's concurrence which states that to let a

41

"policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws." *See* Docket No. 45 at 42 (quoting *Gregory*, 394 U.S. at 120 (Black, J., concurring)). However, a concurrence does not constitute clearly established law.

Plaintiffs cite *Morales*, 527 U.S. at 58, for the proposition that "the entire process of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law." *See* Docket No. 45 at 41. In *Morales*, the Court held that "the purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law." *Morales*, 527 U.S. at 58. However, *Morales* considered the notice provided by a loitering statute, not a dispersal order. *See id.* at 57-58. *Morales* rejected defendants' argument that the unconstitutionality of the loitering statute was remedied by the fact that "a loiterer is not subject to criminal sanctions unless he or she disobeys a dispersal order." *See id.* By contrast, here, there is no challenge to the constitutionality of § 38-115(c). Thus, *Morales* does not speak to the notice requirements of a dispersal order based on § 38-115.

Because plaintiffs have failed to carry their burden to provide clearly established law showing that the dispersal orders violated procedural due process, defendants are entitled to qualified immunity on Claim Eight. *Cf. Ferris v. D.C.*, 2023 WL 8697854, at *13 (D.D.C. Dec. 15, 2023) (refusing to extend "a general due process principle of fair notice" in finding that "any right to fair notice before police use of force is obviously not *clearly established*," noting that "the D.C. Circuit has rejected the idea that a dispersal order is a constitutional prerequisite for every group arrest"). The Court will grant defendants' motion to dismiss Claim Eight.

### 5. *Claims One, Two, Three, and Four – State Law ELEIA Claims*

Plaintiffs bring their state law claims, alleging violations of the Colorado Constitution, pursuant to ELEIA, Colo. Rev. Stat. § 13-21-131. *See* Docket No. 20 at 33-40. "Colorado enacted ELEIA in 2020 to create a cause of action for individuals whose rights are secured by Article II of the Colorado Constitution (that is, the Colorado Constitution's Bill of Rights) and subsequently violated by a peace officer." *Shash v. City of Pueblo*, 770 F. Supp. 3d 1279, 1306 (D. Colo. 2025). Section 13-21-131 states in relevant part:

> A peace officer, as defined in section 24-31-901 (3), who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

Colo. Rev. Stat. § 13-21-131(1). A "peace officer" is defined in § 24-31-901(3) as:

> any person employed by a political subdivision of the state required to be certified by the P.O.S.T. board pursuant to section 16-2.5-102, a Colorado state patrol officer as described in section 16-2.5-114, and any noncertified deputy sheriff as described in section 16-2.5-103(2).

Colo. Rev. Stat. § 24-31-901(3).

Defendants argue that they are not liable under ELEIA because they fall outside the statute's definition of "peace officer." Docket No. 31 at 6-7. Defendants contend that AHEC is not a "political subdivision" of the state. *See id.* at 7-10. Plaintiffs respond that AHEC is, in fact, a political subdivision because the "legislature expressly created AHEC to perform local, municipal-like governance over a defined campus district in

43

Denver and vested the AHEC Board of Directors, the governing body, with powers 'in like manner as a municipal corporation of this State.'"  Docket No. 45 at 4 (quoting Colo. Rev. Stat. § 23-70-105(1)(h)).  Plaintiffs note that, under Colo. Rev. Stat. § 29-1-202(2), a "political subdivision" includes "any other kind of municipal, quasi-municipal, or public corporation organized pursuant to law."  *Id.* at 8.

Williams v. Mollendor, Case No. 2025CV31745 (Den. Dist. Ct. Dec. 23, 2025), considered the issue of whether officers employed by AHEC are peace officers under ELEIA.  *See* Docket No. 59-1.  *Williams* rejected the plaintiff's argument that AHEC possesses powers "analogous to a municipal corporation," and ruled that AHEC peace officers cannot be sued pursuant to ELEIA.  *See id.* at 5, 7.

Because ELEIA does not define a "political subdivision," *Williams* relied on other Colorado statutory provisions that define "political subdivision."  *See id.* at 4.  In the context of public records, Colo. Rev. Stat. § 24-72-100.3(7) identifies counties, cities, towns, school districts, and special districts as political subdivisions.  *See id.*  In the context of county, municipal, and political subdivision retirement systems, a political subdivision is defined as "any district, special district, improvement district, authority, council of governments, governmental entity formed by an intergovernmental agreement, or any other kind of municipal, quasi-municipal, or public corporation organized pursuant to law."  *Id.* (quoting C.R.S. § 24-54-100.3(7)).  *Williams* further noted that "Colorado courts have explained 'both counties and other public entities with special statutory purposes are political subdivisions of the state existing only for the convenient administration of the state government and created to carry out the will of the state' and that the 'express or implied powers of such political subdivisions are

limited to those conferred by the General Assembly.'" *Id.* (quoting *Bd. of Cnty. Com'rs of Cnty. of Boulder v. Hygiene Fire Protec. Dist.*, 221 P.3d 1063, 1068 (Colo. 2009)). By contrast, AHEC's purpose "is specific to creating and maintaining a single education campus complex to house three higher education institutions." *Id.* at 4-5. The Court agrees that, under the available definitions of "political subdivision" pursuant to Colorado law, AHEC does not qualify as a political subdivision.

Furthermore, the Court agrees that Colo. Rev. Stat. § 23-70-105(1)(h) does not provide support for the proposition that AHEC qualifies as a political subdivision. *See id.* at 5. While § 23-70-105(1)(h) states that AHEC can perform "in like manner" as a municipal corporation and "as if the board were a municipal corporation," this language does "not bestow express or implied political subdivision powers upon AHEC." *Id.* at 5-6.

Because AHEC is not a political subdivision, defendants are not peace officers and cannot be sued under ELEIA. Accordingly, the Court will dismiss Claims One, Two, Three, and Four.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that Defendants' Motion to Dismiss [Docket No. 31] is **GRANTED in part and DENIED in part**. It is further

**ORDERED** that Claims Eight and Nine are **DISMISSED with prejudice**.[8] It is further

---

[8] Because defendants are entitled to qualified immunity on these claims, the Court will dismiss them with prejudice. *See Clark v. Wilson,* 625 F.3d 686, 692 (10th Cir. 2010) (instructing the district court to grant defendants' motion to dismiss based on

**ORDERED** that Claims One, Two, Three, and Four are **DISMISSED with prejudice**.[9]  It is further

**ORDERED** that plaintiff Joie Ha's Sixth and Seventh claims are **DISMISSED with prejudice**.  It is further

**ORDERED** that plaintiffs' claims against defendants Joshua Bode, Corrie Curry, John Gaschler, Lance Muniz, Joseph Flageolle, Eric Martinez, and Patrick Flageolle are **DISMISSED with prejudice**.  It is further

**ORDERED** that defendants Joshua Bode, Corrie Curry, John Gaschler, Lance Muniz, Joseph Flageolle, Eric Martinez, and Patrick Flageolle are terminated from this case.

DATED March 25, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge

---

qualified immunity "with prejudice"); *McCrary v. Jones*, 2015 WL 873641, at *6 (W.D. Okla. Feb. 27, 2015) (dismissing claim with prejudice where defendant was entitled to qualified immunity).

[9] "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).  Given that ELEIA does not permit suit against AHEC officers, the Court finds that plaintiffs fail to state claim under Rule 12(b)(6) and that amendment would futile.  Thus, the Court will dismiss the state claims with prejudice.